# IN THE UNITED DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **SCOTTIE A. BAGI, et al.** | : | **CASE NO. 1:14-CV-00558** |
| | : | |
| **Plaintiffs,** | : | **JUDGE DONALD C. NUGENT** |
| | : | |
| **vs.** | : | |
| | : | |
| **CITY OF PARMA** | : | |
| | : | |
| **Defendant.** | : | |

---

## MEMORANDUM IN SUPPORT OF DEFENDANT,
## CITY OF PARMA'S MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

Table of Contents................................................................................................i

Table of Authorities...........................................................................................ii

I.  Statement of the Issues to be Decided ........................................................1

II.  Summary of the Argument ........................................................................1

    A.  Introduction ..........................................................................................1

    B.  Allegations.............................................................................................3

    C.  Relevant Facts/History .........................................................................3

        1. TEMS Unit .......................................................................................3

        2. 2004 TEMS Unit ..............................................................................4

        3. 2004 TEMS Test ..............................................................................5

        4. Aftermath of 2004 TEMS Unit Test...............................................6

        5. Prior to the 2011 TEMS Unit Test and Letter ...............................8

        6. 2011 TEMS Unit Test .......................................................................9

        7. July 20, 2011 Letter at Issue ..........................................................13

        8. Other Signatories to the Letter .....................................................13

        9. Plaintiff Vojtush...............................................................................15

        10. Delivery of the Letter ....................................................................16

          a. Fire Union...................................................................................16

          b. Plaintiff Bagi..............................................................................17

        11. Fire Department Investigation .....................................................18

        12. City Investigation of Signatories .................................................19

        13. Arbitration Determinations ..........................................................20

        14. Union Actions................................................................................21

        15. Effect of Letter on the Department...............................................21

**III.**     **Legal Argument** ............................................................................................ **23**

      **A.**       **Summary Judgment Standard** ............................................................ **23**

      **B.**       **Plaintiffs First Amendment Claim Fails as a Matter of Law** ............ **24**

           **1. Plaintiffs Made False Accusations Not Protected by the First Amendment** .................................................................................. **24**

           **2. Plaintiffs Made Their Complaints in Their Official Capacities** .................... **25**

           **3. First Amendment Retaliation Analysis** ........................................... **27**

           **a.  Plaintiffs' Speech is Not a Matter of "Public Concern"** ........................ **27**

           **b. Parma has a Superior Interest in Managing its Firefighters than Plaintiffs Have in Accusing Superiors, Without any Basis, of Unfair Testing Procedure** ............................................................... **28**

**IV.**     **Conclusion** ...................................................................................................... **30**

**Certificate of Tracking and Page Limitation** ............................................................. **31**

# TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).................................................................... 23

*Arnett v. Kennedy*, 416 U.S. 134 (1974)......................................................................................... 29

*Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989) .................................................. 29

*Celotext Corp. v. Catrett,* 477 U.S. 317, 327 (1986).................................................................. 24

*Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997)............... 27

*Connick v. Myers*, 461 U.S. 138, 147 (1983) .......................................................... 1, 24, 26, 27

*Fitzpatrick v. City of Frankfort, Kentucky*, 305 Fed. App'x 258, 263-64 (6th Cir. 2008) ...................... 29

*Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ...................................................................... 26

*Haynes v. City of Circleville, Ohio,* 474 F.3d 357 (6th Cir. 2007)................................................ 1, 26, 27

*Matulin v. Village of Lodi,* 862 F.2d 609, 612 (6th Cir.1988)................................................. 27

*Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006)................................................ 26

*Moorer v. Copley Tp.*, 98 F.Supp.2d 838, 844 (N.D. Ohio 2000).......................................... 29

*Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) .............................................................. 28

*Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) ............................................... 1, 27, 29

*See v. City of Elyria*, 502 F.3d 484, 492–93 (6th Cir. 2007)................................................ 25

*Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220, 1227 (6th Cir.1997)...................... 28

*Westmore v. Sutherland,* 662 F.3d 714, 721 (6th Cir. 2011)............................................ 1, 24

*Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1535 (6th Cir. 1994) ................................ 25

## I.    STATEMENT OF THE ISSUES TO BE DECIDED

**Issue 1:**    False statements do not constitute protected speech.   A public employer who takes disciplinary action in response to false statements made by an employee is not liable for a First Amendment freedom of speech claim.  The Sixth Circuit has repeatedly held employee speech is not a matter of public concern if the statements were made "with knowledge of, or reckless indifference to, their falsity."  *See v. City of Elyria,* 502 F.3d 484*; Westmore v. Sutherland,* 662 F.3d 714, 721 (6th Cir. 2011).  False accusations against a captain alleging he gave answers to a test and a fellow firefighter accepted answers is not protected speech.

**Issue 2:**    Employee complaints about a supervisor or internal fire department unit made by an employee in his/her professional capacity or in the course of official business are not protected by the First Amendment.  *Haynes v. City of Circleville, Ohio,* 474 F.3d 357 (6th Cir. 2007).

**Issue 3:**    Employee complaints about treatment under personnel rules are not matters of public concern and do not raise a prima facie constitutional claim. *Connick v. Myers*, 461 U.S. 138, 147 (1983).

**Issue 4:**    Employers may discipline public employee's speech to maintain the employer's interest in promoting the efficiency and effectiveness of the public services it performs including consideration of whether the comments undermine legitimate goals or mission of the employer, create disharmony among co-workers, impair discipline by superiors or destroy the relationship of loyalty and trust.  *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003).

## II.   SUMMARY OF THE ARGUMENT

### A.    INTRODUCTION

Only one claim remains pending in this case:   Plaintiffs', Scott Bagi and Gary Vojtush's, allegation that their First Amendment freedom of speech was violated when they sent their Fire Chief a letter falsely accusing their Captain of giving answers to a recent internal fire department test and implying a fellow firefighter used the answers.  The letter signed by Plaintiffs specifically provides:

> However, there has been discontent within your ranks as many are under the belief that **Captain Poznako gave the answers, or at least identified the areas to specifically study,** to his friends and close associates so they could perform well on the test.
> * * *
> If a less qualified person is selected for a SWAT position due to improper selection **(such as giving answers in advance)**, there becomes a complete lack of interest in any of us putting forth the effort to become better fireman/paramedics . . . (emphasis added).

(See Exhibit A, Letter dated 7/20/2011[1], hereinafter "the Letter")[2]

---

[1] The Letter is actually dated 7/20/2010 but Plaintiffs admit the date was a clerical error and the Letter was dated 7/20/2011.

It is undisputed that:

- Plaintiff Bagi sought out six other firefighters, almost all of whom had disagreements with the Captain, to sign the Letter, either while on duty or at a shift change.

- The five, Non-Plaintiff signatories all admit they signed the Letter as Parma firefighters, not private citizens, at the firehouse, with the intent that it was to only go to the Fire Chief.

- Most of the signatories did not read the entire Letter and were unaware of its actual content.

- The signatories that read the Letter testified they <u>only</u> agreed to sign it because Plaintiff Bagi told them he was taking the test and would only turn it in if the highest scorers were not selected and something improper in the testing procedure occurred.

- It is undisputed that no one had any information that the Captain "gave the answers, or at least identified the areas to specifically study, to his friends and close associates" or that Firefighter Fetter, the undisputed highest scorer, accepted answers.

- Despite not taking the test or having any information anything was inappropriate, Plaintiff Bagi gave the Letter to the union to present the complaint to the Fire Chief. When the union president read the Letter and confirmed no information existed to support the false allegations, the union refused to give the Letter to the Fire Chief. Therefore, Plaintiff Bagi gave the Letter to the Fire Chief and the HR Director responsible for the Fire Department.

- The Captain and Firefighter Fetter were investigated by the Fire Department for the alleged accusations.

- When the investigation of the Captain and Fetter concluded, none of the signatories had any information to support the false allegations. Therefore, the Fire Department had to investigate the signatories for the false allegations. None of the signatories could support the allegations against the Captain and Fetter.

- Because Plaintiff Bagi drafted the Letter and Plaintiff Vojtush had a significant previous discipline issue, the Fire Chief recommended termination for the false statements. The Parma Safety Director reduced the discipline to thirty four and thirteen tour suspensions respectively. After grieving and arbitrating the discipline, the arbitrators concluded Plaintiffs falsely accused the Captain and Fetter of cheating but the discipline was too severe and reduced the discipline to eight and two tour suspensions.

Plaintiffs sent the Letter to the Fire Chief as Parma Fire Department employees with complaints about a supervisor concerning an internal fire department test. Plaintiffs and the other signatories admit

---

[2] A complete index of all Exhibits is set forth in the Appendix.

they had no information to support the false allegations in the Letter. The First Amendment does not protect false speech or simple employment related complaints. Even if Plaintiffs' claim could be construed as speech of a private citizen, and not a Parma firefighter, Plaintiffs' unsubstantiated complaints involve a supervisor and an internal fire department test and do not rise to a matter of "public concern". Moreover, the law permits an employer to discipline employees when their speech is intentionally or recklessly false or disrupts the efficiency and effectiveness of the employer's operation and morale. Therefore, Plaintiffs' claim should be dismissed and Defendant City of Parma's summary judgment should be granted as a matter of law.

## B. ALLEGATIONS

Plaintiffs originally filed a two count Complaint on March 13, 2014 alleging 1) a First Amendment claim and 2) a FMLA claim. (R.1, Complaint). After the City of Parma ("City") filed a Partial Motion for Summary Judgment regarding Plaintiffs' FMLA allegations, Plaintiffs voluntarily dismissed the FMLA claim. (R.27, Partial Motion for Summary Judgment; R.36, Notice of Dismissal).

Over 15 firefighters have been deposed and over 7,000 pages of documents have been produced in this case. This is Plaintiffs' second bite at the apple as two arbitrators already upheld Plaintiffs' discipline for the false allegations. The City hereby requests this Court to dismiss Plaintiffs' remaining claim as the First Amendment does not shield an employee from discipline for falsely accusing a superior and co-worker of giving and receiving answers for an internal fire department test as a matter of law.

## C. RELEVANT FACTS/HISTORY

### 1. TEMS Unit

This dispute stems from Plaintiff Bagi failing an internal fire department test to qualify for the Tactical Emergency Medical Service Team or "TEMS" unit in 2004. The Parma Fire Department ("Fire

Department") reformed a TEMS Unit in 2004[3]. (Bagi at p. 53; Ex. C, Deposition of Fire Chief John French at p. 37).

TEMS is a specialized unit of the Fire Department. The TEMS Unit consists of select Fire Department paramedics who provide direct support to the Parma Police Department SWAT Unit (Ex D, Deposition of Firefighter Mike Whelan at pp. 38-40). The TEMS Unit members are armed, wear tactical gear and respond to incidents with SWAT members. The TEMS Unit's primary purpose is to provide medical treatment to any SWAT members that may become injured at a crime scene. (French at pp. 32-33; Whelan at p. 39). If a citizen or perpetrator is injured, a TEMS Unit member must first provide medical care to any injured SWAT member. (French at p. 33). If a SWAT member is not injured, a TEMS Unit member may provide medical care to a perpetrator or citizen until another emergency medical unit arrives. However, the sole purpose of the TEMS Unit is to provide medical treatment to SWAT members – not to the community at large. (French at p. 33). The average person does not even know a TEMS unit exists. (French at p. 34).

## 2. **2004 TEMS Unit**

When the new Fire Chief, John French, took office in 2002, the SWAT team worked with him to reform the TEMS Unit. (French at p. 38). The Fire Department Collective Bargaining Agreement ("CBA") specifically provides that the Fire Chief has the sole discretion to appoint Parma Firefighters to specialty units, including the TEMS Unit. (Ex. E, Section 33.08 of the CBA; Bagi at pp. 44, 53). The TEMS Unit is NOT governed by the Civil Service Commission and the Civil Service Commission Regulations and Requirements have no application with regard to the selection of firefighters for the TEMS Unit. (French at pp. 43-44; Whelan at p. 41). However, the SWAT commander has the right to refuse to accept any proposed firefighter for the TEMS Unit and ultimately determines who becomes a member of the TEMS Unit. (Whelan at p. 39-40).

---

[3] The TEMS Unit was originally created in 1994 until it was disbanded in approximately 1999. (Ex. B, Deposition of Plaintiff Scott Bagi at 54-55).

Because Captain Poznako was a shift commander, EMS coordinator and had prior experience as a Fleet Marine Corpsman in the Navy, Chief French appointed Captain Poznako in charge of the TEMS Unit. (French at pp. 38-40). Captain Poznako reported to Chief French. While it was within Chief French's discretion to appoint firefighters to the TEMS Unit, subject to the SWAT commander's acceptance, Chief French and Captain Poznako agreed in 2004 to create the first of its kind test for the TEMS Unit to select four firefighters for the TEMS Unit. (Bagi at p. 58-59).

### 3. 2004 TEMS Test

Captain Poznako worked with the SWAT Team to determine what they wanted on the TEMS Unit test to select new members. (French at p. 40). As a result, Captain Poznako developed five components to the TEMS Unit test that consisted of the following:

1) 100 written questions based upon textbooks used by paramedics; a candidate had to receive an 80% or greater on the written test in order to complete the remaining four sections of the test. The remaining four sections included:

2) Practical Trauma Assessment taken from the International Trauma Life Support course;

3) A physical agility exam administered by the police department;

4) An evaluation of written run reports including 15 run reports of each of the candidates; and

5) An oral interview component with four SWAT Officers and Captain Poznako. (Whelan at pp. 8-11, 27).

On February 13, 2004, Captain Poznako sent an email to all Parma Firefighters informing them of the upcoming 2004 TEMS Unit test. (Ex. F, Poznako email dated 2/13/04, bate stamped 2413). Captain Poznako specifically announced that a Parma Firefighter had to have a minimum of two years of service to be eligible to take the exam. (Ex. G, Poznako email dated 5/20/04, bate stamped 2414;Bagi at pp. 232-233; Whelan at p. 8).

An informational meeting was held on May 25, 2004 for anyone interested in taking the test; the different components of the test were discussed as well as a list of study materials. (Bagi at pp. 55-56; Ex. G, email dated 5/20/04; Ex. H, Poznako memo outlining 2004 TEMS test dated 6/4/04, bate stamped 2416). Six Parma Firefighters took the 2004 TEMS Unit test on June 4, 2004: Plaintiff Bagi

and firefighters: Mike Whelan, Tony Mlady, Tony DeCarlo, Mark Bazemore and Jeff Patterson. Plaintiff Vojtush did not take the 2004 TEMS test. (Ex. I, Deposition of Plaintiff Gary Vojtush at p. 62). The only knowledge Vojtush possesses regarding the 2004 TEMS test is rumors and hearsay he heard from other firefighters. (Vojtush at 75).

After the multiple choice test was completed, Plaintiff Bagi and three other firefighters did not receive an 80% on the test. While candidates were permitted to review their test, Plaintiff Bagi admits he never reviewed his answers. (Bagi at pp. 58, 62-64; Whelan at pp. 29-30). However, because all six candidates missed several of the same questions, Captain Poznako had Firefighter Al Gatka, a Tri-C Instructor and union officer, review the questions. (Whelan at pp. 30-31; Ex. J, Affidavit of Captain Pete Poznako). As a result, credit was given for several questions where more than one answer was determined to be appropriate per Gatka. (Whelan at pp 30-31). Specifically, the following candidates received additional points for their answers to the questions at issue: Bagi (8 points); DeCarlo (8 points); Mlady (8 points); Bazemore (7 points); Patterson (5 points); Whelan (4 Points). (Whelan at pp. 33-37; Ex. K, Whelan handwritten notes re: scoring of the 2004 TEMS test written questions). As a result, the extra points increased all the candidates scores, including DeCarlo and Mlady, whose score increased over 80% and received a passing grade. However, even with the 8 additional points Plaintiff Bagi received, his score only rose from a 55% to a 63% and neither Plaintiff Bagi nor Firefighter Patterson passed the 2004 TEMS Unit test. (Ex. L, Poznako email dated 6/6/04, bate stamped 4044[4];Bagi at p. 62).

### 4. Aftermath of 2004 TEMS Unit Test

Despite the unrefuted testimony above, Plaintiff Bagi believes questions were purposely eliminated so that certain firefighters would receive an 80% passing grade and could proceed with the testing process while he was rejected. (Bagi at p. 65). Bagi never reviewed his exam to determine what

---

[4] While the term "curve" has been applied to the additional points given to each candidate for more than one correct answer to the question, it is undisputed that the points were given as detailed above and a traditional bell curve was not applied. (Whelan at pp. 36-37).

questions he missed or what questions he was given credit for or whether questions were eliminated. (Bagi at pp. 58, 64). In fact, Bagi believed Captain Poznako was biased and favored the four individuals that passed the written exam: Whelan, DeCarlo, Bazemore and Mlady. (Bagi at pp. 65-69). Bagi admits he believed Captain Poznako was biased against him and not "fair" before the 2004 test because he yelled at Bagi regarding things like wearing shower shoes in the firehouse, where he parked his car and was upset when Bagi told Poznako as he turned in his test that someone else should grade the 2004 TEMS test, not Poznako. (Bagi at pp. 75-76, 103-105). Even though Bagi admits he has no knowledge regarding how the 2004 test was actually graded, Bagi assumed that when he heard the test was "curved," that it meant questions were thrown out so firefighters whom Captain Poznako liked would pass. (Bagi at pp. 60-62, 65-69, 531)[5].

Plaintiff Bagi admits he complained about his conspiracy theory that two of the four TEMS Unit members received a "curve" so they could pass the test to several people who investigated his complaints. Specifically, Bagi complained to the 2004 Union President Nick Kashi, subsequent Union President Dave Light, current Union President Pat Lovejoy, Chief French and Captain Poznako. (Bagi at pp. 69-71; Ex. L, Poznako email dated 12/6/10, bate stamped 4044).

The Union Presidents investigated Bagi's concerns, including speaking to Captain Poznako and reviewing the 2004 test results and informed Bagi that nothing improper occurred with the grading of the 2004 TEMS Unit multiple choice test. (Bagi at. pp. 77-80; Ex. L, Poznako email to Lovejoy dated 12/13/10, bate stamped 4044). Union President Kashi told Bagi that there was no rule prohibiting the test from being curved and credit being given for multiple answers to questions and the Union would not do anything further. (Bagi at pp. 77-78). Bagi complained again to Union President Dave Light in 2006 about the 2004 TEMS test and grading of the multiple choice section. (Bagi at pp. 78-79). Bagi believes Light and Kashi spoke to Captain Poznako and investigated his complaints. (Bagi at pp. 79-80).

---

[5]Any cited testimony of Plaintiffs that might be subject to the CPO is not attached hereto. However, complete copies of Plaintiffs' transcripts subject to the CPO will be filed under seal.

Bagi complained to Chief French in 2007 about the way the 2004 TEMS test was graded. (Bagi at pp. 80-83). Again, each time Bagi complained to Chief French and the union officials, Bagi believes his complaints were investigated and he was never disciplined. (Bagi at pp. 71, 79-80, 84-86).

When the union elected a new president, Pat Lovejoy, in approximately 2010, Bagi complained to Lovejoy about the 2004 TEMS test. (Bagi at pp. 79-85). Lovejoy investigated his complaints of favoritism and impropriety and told Bagi there was nothing inappropriate. (Ex. M, Deposition of Union President Pat Lovejoy at pp. 41-42,168-172). Lovejoy even reviewed the 2004 tests to make sure everyone received equal credit for the same answers. (Lovejoy at p. 171). Each time, Bagi complained to the union, he did so as a firefighter and union member. (Lovejoy at p. 169).

### 5. Prior to the 2011 TEMS Unit Test and Letter

In late 2010, Firefighter DeCarlo left the TEMS Unit. On December 6, 2010, Bagi went so far as to email Captain Poznako and request to replace DeCarlo on the TEMS Unit even though Bagi knew he failed the 2004 TEMS test. (Bagi at p. 533-534; Ex. N, Bagi email exchange with Poznako regarding 12/6/10). Captain Poznako explained that the Fire Chief and Police Chief did not intend to fill the vacancy at that time. (Ex. N, Bagi email exchange with Poznako). Captain Poznako also explained that because Bagi failed the written portion of the 2004 TEMS Unit test, he never completed the exam and was not "next in line" to replace TEMS members. Rather, a competitive exam would be administered to fill any future openings on the TEMS Unit. (Id.). Bagi responded and basically asked Captain Poznako to throw out questions so he could pass the test. Bagi emailed Captain Poznako the following:

**Scott Bagi**

| | | | |
|---|---|---|---|
| From: | Scott Bagi | Sent: | Mon 12/13/2010 9:50 AM |
| To: | Pete Poznako | | |
| Cc: | | | |
| Subject: | RE: 12-6-2010 Swat Team | | |
| Attachments: | | | |

Capt Poznako, I truly respect the Chiefs decision to only have 4 members on the team. However, if I remember correctly FF Decarlo and FF Mlady also failed but you throw out handpicked questions creating a curve in the grading scale ultimately giving them a passing score. I presumed that I would also be extended the same courteously ? Thx Scott

(Ex. N, Bagi email exchange with Poznako regarding 12/6/10; Bagi at p. 533-534).

Meanwhile, in January, 2011, Bagi admits he was upset with prior confrontations with Captain Poznako and believed Captain Poznako was out to get him. (Bagi at pp. 379-380). Everyone was aware that Bagi did not get along with Captain Poznako. (Lovejoy at p. 210-214; Ex. LL, Deposition of David Knecht at p. 81; Ex. MM, Deposition of Tom Kolar at p. 39; Ex. NN, Deposition of Dan Gaurdino at p. 114-115; Ex. OO, Deposition of Mike Kinney at p. 57). In March, 2011, the Fire Chief was preparing to transfer Bagi to Station 3 where he would be supervised by Captain Poznako. Bagi wrote Chief French raising concerns he had about working with Captain Poznako but he later withdraw his concerns to the Fire Chief about Captain Poznako. (Ex. O, Bagi correspondence dated 3/28/11, bate stamped 796-798).

### 6. 2011 TEMS Unit Test

On June 6, 2011, Captain Poznako emailed the Parma Firefighters that a competitive exam would be held for an appointment to the TEMS Unit. The notice specifically provided: "Applicants must have at least three years on the Parma Fire Department and be a functioning Paramedic." (Ex. P, Poznako email dated 6/6/11, bate stamped 4050). The years of service requirement was increased from two years in 2004 to three years to match the revised standard established by the Police Department. (Whelan at pp. 56-60). Within two hours of sending the notice, Bagi responded to Captain Poznako to "put me in" for the exam. (Ex. P, email dated 6/6/11, bate stamped 4050).

On June 27, 2011, Captain Poznako notified the seven firefighters that expressed an interest in taking the test that an informational TEMS meeting will be held on July 6, 2011 to discuss the test, study materials and any questions regarding the testing procedure. (Ex. Q, Poznako email dated 6/27/11, bate stamped 780).

At the meeting, Firefighter Whelan and Bazemore were introduced as the individuals administering the test. (Ex. R, Deposition of Ricky Fetter at. pp. 47-48). Whelan and Bazemore explained the details of the exam, how it would be scored, including the ISBN number for the book to

study if anyone wanted to purchase it. (Id.). Each candidate was also given a CD rom with all the power point slides that were presented. (Id.).

While all the other applicants attended the meeting, Bagi admits he never attended the informational meeting. (Bagi at p. 114; Whelan at p. 52). Instead, he emailed Captain Poznako the day after the meeting and asked him to "let me know any info. that I will need to know for SWAT Team." (Ex. S, Bagi email dated 7/7/11, bate stamped 4063). In response, Captain Poznako responded the next day with detailed information about the test, the study materials and even set aside an information packet for Bagi that he could pick up regarding the 2011 TEMS Unit test. (Ex. T, Poznako email dated 7/8/11, bate stamped 4064).

Bagi admits he never picked up the information packet Poznako reserved for him. (Bagi at pp. 120-121). Rather, after Captain Poznako sent Bagi the July 8, 2011 email detailing the information regarding the testing procedure, Bagi admits he decided not to take the test and began writing the July 20, 2011 Letter at issue in this case to the Fire Chief. (Bagi at p. 120).

The only other thing Bagi did to obtain information regarding the 2011 TEMS Unit test, the testing procedure, how it would be administered etc. was to ask Firefighter Ricky Fetter on July 17, 2011 for a copy of his study materials. (Bagi at pp. 121-124; Fetter at p. 49). Since Fetter had ordered and studied the reference book twice and copied all the study material provided at the informational meeting, he gave Bagi all the testing information. (Fetter at pp. 48-52; Ex. U, Fetter handwritten chronology notes; Ex. V, 2011 testing procedure information bate stamped 568-570). Thus, Bagi admits that when he wrote the Letter to the Fire Chief accusing Captain Poznako of giving "the answers or at least identified the areas to specifically study to his friends and close associates so they could perform well on the test," and implying that Fetter was selected for the TEMS Unit because he received answers from Captain Poznako, the ONLY information he had was his email correspondence from Captain Poznako regarding information about the test and the study materials Fetter gave him. (Bagi at pp. 123-124).

Bagi also claims he considered "table talk" of other firefighters he heard talking at the firehouse when writing the Letter, but no one implied anything improper occurred nor did Bagi bother to find out if anything he heard was true. (Bagi at pp. 143-144). The rumors Bagi heard included whether firefighter Mike Frantz would be involved in the testing process, there would be an interview component, his suspicions that the Fire Department decided to fill a vacancy when they didn't fill it in 2010 when DeCarlo left and he thought they reduced the minimum required years of service from five years to three years, although he admits the test announcements reflect the minimum year requirements increased from 2 years in 2004 to 3 years in 2011 in compliance with the police requirements. (Bagi at pp. 134-144; Whelan at pp. 56-60). Bagi testified:

Q: You didn't find out specifically how Mike Frantz was going to be involved in the 2011 TEMS test, right?

A: I don't' think I knew exactly what he was doing except he was going to play a role in the testing process.

Q: Okay. You didn't find out how the interview process was going to work?

A: I don't' think that was in Captain Poznako's e-mail.

Q: Right. It's just that you knew there was going to be an interview. You didn't know who was going to do the interview, right?

A: Correct. I assumed it was going to be in-house.

Q: But you never confirmed that assumption?

A: Well, yes and no. I'm going off the 2004 test where they did it basically within the fire and police departments.

Q: So you assumed what happened in 2004 would be applied in 2011?

A: Yes.

Q: But you didn't do any independent research to find out if 2011 would be the same with the interview process?

A: Well, I only received the information that was given to me by Captain Poznako.

Q: And we've identified that through Exhibits 5 through 10?

A: Yes. And he' - - okay.

11

(Bagi at pp. 142-144).

Had Bagi bothered to attend the informational meeting, he would have known Captain Poznako was preparing to retire so Whelan designed the 2011 TEMS examination and had total control over the textbook, selection of test questions, answer key and test generating software. (French at 41-42; Whelan at pp. 41-42). In fact, Whelan chose a standardized test from a brand new book that had not been published yet so no one had an advantage. (Whelan at pp. 41-42, 48-51, 54-55, 136). Captain Poznako took no part in the creation of the exam and had no knowledge of the questions prior to the TEMS test date. (Whelan at p. 55, 136). Whelan also performed the final grading of the written exams, including giving credit for more than one correct answer if applicable, similar to the 2004 test grading. (Whelan at pp. 63-64).

Whelan also administered the physical fitness test in cooperation with the Parma Police SWAT Team. (Whelan at p. 44). TEMS member Bazemore and City Medical Director Dr. Carl Shikowski developed and graded the Trauma Assessment Component of the TEMS test. (Whelan at p. 43, 45-46). Firefighter Frantz performed the Documentation Assessment again as he reviews run reports for the Fire Department and graded the Document Assessment for the 2004 TEMS test. (Whelan at p. 43, 66-67). Oral interviews were also included in the 2011 process but only Police SWAT Team supervisors graded candidates. (Whelan at pp. 44-45).

Had Bagi or anyone inquired, they would have discovered that Captain Poznako took no part in creating or grading the written examination, document assessment or oral interviews. Whelan coordinated the overall exam and was not aware of any candidates receiving additional information regarding the test other than what was provided at the informational meeting. (Whelan at p. 54, 62-63). Bagi admits he did not know nor did he find out, how the test was being administered, that Whelan wrote the written exam, or any other components of who graded the exam. (Bagi at p. 193). Bagi wrongly assumed. Bagi's only basis for his "belief" that Captain Poznako "gave answers" was because Fetter was ultimately selected. (Bagi at p. 198).

Five Parma Firefighters participated in the 2011 TEMS test: Fetter, Ron Iaroboni, Joseph Posa, Joseph Owens and Patterson. All five received a score of 80% or greater on the written exam and all five passed the exam. (Ex. W, 2011 test results; Whelan at pp. 71-71). The test takers with the two highest scores were appointed to the TEMS Unit in October 2011: Fetter and Iacoboni. (Whelan at p. 71). No one disputes Fetter obtained the highest test score.

### 7. July 20, 2011 Letter at Issue

Bagi could not recall specifically when he wrote the July 20, 2011 Letter but recalls it occurred over a couple of weeks while he had his lawyer help him draft and revise it[6]. (Bagi at pp. 144-149). However, Bagi admits once he and his lawyer finalized the Letter, he printed it on or about July 20, 2011, twelve days before the TEMS test was given on August 1, 2011. (Bagi at pp. 148-149). The third page of the Letter was a photograph of Captain Poznako and Firefighters Fetter, Frantz, Brad Flynn and their wives at Fetter's daughter's graduation party. (Ex. A, the Letter; French at pp. 59-61). Bagi admits he took the photo from Fetter's or Fetter's wife's Facebook page. (Bagi at p. 520).

### 8. Other Signatories to the Letter

No one else was involved in the creation of the July 20, 2011 Letter. (Bagi at p. 162). Bagi admits he contacted eight other firefighters to sign his Letter[7]. Two of the firefighters refused to sign the Letter. (Bagi at p. 206). The six firefighters that signed the letter admit they either had an issue with or disliked Captain Poznako or were only signing the Letter to support Bagi if he took the exam and the highest scorer was not appointed. (Kolar at p. 21-24;French at pp. 101-105, 135-136; Lovejoy at pp. 214-215; Vojtush at pp. 92-106; Knecht at pp. 63-71; Gaurdino at pp. 128-131; Kinney at pp. 15, 63; Ex. PP, Deposition of Chris Tibbitts at p. 47). Gaurdino testified that in retrospect, he believes Bagi targeted him to sign the Letter because of Gaurdino's prior conflicts with Captain Ponzako. (Gaurdino at pp. 84-85, 106-109, 112, 115).

---

[6] Bagi testified he no longer has an electronic version of the Letter and as a result, the exact date the Letter was created could never be determined. (Bagi at pp. 127-131).

[7] The Fire Department employs over 100 firefighters. (French at p. 54).

It is undisputed Bagi had the other six signatories sign the Letter at the firehouse either while they were on duty or just getting off duty. (Bagi at pp. 170-171; Knecht at pp. 64-56; Kolar at pp. 55-56; Gaurdino at pp. 116-117; Kinney at p. 67; Tibbitts at pp. 44-45). Most of the signatories admit they did not read the Letter or only read part of it, including Plaintiff Vojtush. (Vojtush at p. 174; Gaurdino at pp. 37-38; 48, 89; Kinney at pp. 14-15; Tibbetts at p. 45). Most signatories testified the third page with the photo was not part of the Letter when Bagi had them sign the Letter. (Ex. X, Summary of Non-Plaintiff Signatories' Testimony). Rather Bagi told them the general content of the Letter and they signed it because they thought Bagi was taking the test and wanted to support him if he was the top tester and was not selected. (Knecht at pp. 68-71, 81-83; Kolar at pp. 21-23; Gaurdino at pp. 38-40, 85-86;Kinney at p. 13-15,75-76,100-101,104). The Non-Plaintiff signatories all admit they signed the Letter as Parma Firefighters regarding a complaint to the Chief. (Knecht at pp. 69-70; Kolar at pp. 58-59; Gaurdino at p. 118; Kinney at p. 77; Tibbitts at p. 47).

Not one signator possessed any information that Captain Poznako "gave the answers or at least identified the areas to specifically study," including Plaintiff Bagi. (Bagi at p. 198, 540-543; Vojtush at pp. 150-151; Knecht at pp. 8-9; 61-71; Kolar at pp. 50-53; Gaurdino at p. 94-95; Kinney at pp. 79-83, 97; Tibbitts at p. 47). Because of his extensive experience and training, no one thought Fetter was not qualified or received answers in advance. (Ex. RR, Deposition of Dennis Ryan at p. 114; Whelan at p. 89; Knecht at p. 70; Kolar at p. 61; Kinney at p. 108; Tibbetts at p. 50). In fact, most firefighters expected Fetter to perform well on the exam. (French at p. 50; Lovejoy at p. 179; Kolar at p. 61; Gaurdino at p. 131; Kinney at pp. 30,77, 80-81; Tibbetts at p. 23, 50).

Many felt they were misled or "duped" by Bagi and thought they were just signing something to support him that would only go to the Fire Chief if he was the top scorer and was not appointed. (Lovejoy at p. 206; Knecht at pp. 68-71; Kolar at pp. 21-24; 55-56). Many were upset when they learned of the specific accusations in the Letter. In fact, some signatories apologized to Captain

Poznako and Fetter for the Letter after it was submitted to the Fire Chief. (Kolar at p. 71; Gaurdino at 120-121).

### 9. Plaintiff Vojtush

Plaintiff Vojtush admits he did not sign up for the 2011 TEMS test and did not have any knowledge regarding how the 2011 test would be administered. (Vojtush at p. 127). The only information Vojtush had about the 2004 or 2011 TEMS test was what he learned from rumors and hearsay. (Vojtush at p. 75, 127). Bagi called Vojtush "out of the blue" a couple of weeks before he signed the Letter and only told him that he would be writing a Letter to the Fire Chief and the Letter "would be looking into the process and trying to take away any personal biases or anything like that from the process." (Vojtush at pp. 114, 116, 117). Bagi did not read the Letter word for word at that time but Vojtush agreed to sign the Letter. (Vojtush at pp. 114, 135).

A couple of weeks later, Bagi called Vojtush while Vojtush was on duty and told him to stop at Station 3 to sign the Letter. (Vojtush at pp. 176-177). Vojtush was in a hurry to get home that day. Therefore, he left Station 1 where he had been on duty, working and met Bagi at Station 3 where Bagi on duty. (Vojtush at pp. 176-177). Vojtush did <u>NOT</u> read the Letter. (Vojtush at pp. 174). Rather he turned to page 2 of the Letter, and signed it as he held the Letter against a special operations trailer at Station 3. (Vojtush at pp. 174-175).

Once Vojtush actually read the Letter after it was submitted to the Fire Chief, he admitted he does not have any knowledge that Captain Poznako gave answers or identified areas to study to friends, he does not know of anyone that was selected for the TEMS unit in 2004 that was not qualified; he did not know what type of test was used in 2004 or 2011 for the TEMS test; he is not aware of any rule that requires 5 years of service to take the TEMS test in 2011 and admits that if Fetter actually received the highest score on the test, he should be appointed. (Vojtush at pp. 146-160; 203). Vojtush also admits he never "asked any questions of who was what, where, when . . ." and had no intent to find out. (Vojtush at pp. 161-162). Vojtush further admits he did not do any kind of investigation or research to find out if

Captain Poznako gave answers. (Vojtush at pp. 380-381). In fact, Vojtush did not even know the Letter stated that Captain Poznako gave answers until after it was submitted to the Fire Chief. (Vojtush at p. 382).

### 10.  Delivery of the Letter

Once Bagi had the six other signators sign the Letter between July 20, 2011 and August 1, 2011, he mailed the Letter to himself in a sealed envelope. If Fetter was not selected, Bagi was going to throw away the Letter. (Bagi at p. 176). Once Fetter was announced as the highest scoring candidate of the TEMS test, Bagi went to the union with this complaint as he had done in the past to have the union turn in the Letter. (Bagi at p. 207).

### a.  Fire Union

On or about Saturday, October 15, 2011, Bagi gave the Letter in the sealed envelope to Union Vice President Marty Cooper and asked him to give it to Union President Lovejoy to deliver to Chief French. (Bagi at pp. 207-208; Lovejoy at p. 37). Cooper gave Lovejoy the sealed envelope from Bagi to deliver to Chief French on or about Tuesday, October 18, 2011. (Lovejoy at pp. 15-16, 38). Uncomfortable delivering a Letter without knowing the content, Lovejoy opened the sealed Letter and read it. (Lovejoy at p. 16-17).

Lovejoy's initial reaction was the Letter "was an accusatory letter in regards to the testing process for the TEMS unit" (Lovejoy at p. 18). His second reaction was "I hoped that they had proof." (Lovejoy at p. 18). After reading the Letter, Lovejoy called Bagi. Bagi asked Lovejoy to deliver the letter to Chief French. (Lovejoy at p. 38). Lovejoy asked him if "he had any kind of concrete substance of proof to his claim that this happened." (Lovejoy at pp. 18-19). Bagi's only response was that he predicted Fetter would be selected. (Lovejoy at p. 19). Without any further proof or information to substantiate the allegations in the Letter, Lovejoy told Bagi he would not submit the Letter to the Fire Chief. (Lovejoy at p. 21). Rather, Lovejoy told Bagi he should be careful as to what he says about someone, he should talk to the Chief and recommended he take a different course of action. (Lovejoy at

pp. 43-44). Lovejoy cautioned Bagi that he should be careful about what he is alleging without a "substantial basis". (Lovejoy at p. 44; 209-210). Lovejoy believed the Letter accused Poznako of cheating and was inaccurate. (Lovejoy at p. 45, 183, 197-198). When Lovejoy refused to submit the Letter, Bagi told Lovejoy he needed the Letter back. (Lovejoy at p. 21). When Lovejoy told Bagi he would leave the Letter in Bagi's mailbox at work, Bagi asked Lovejoy to give the Letter to the Fire Chief's secretary, Mary Kay, instead and Bagi would pick up the Letter from Mary Kay when he could. (Id.) Therefore, Lovejoy left the Letter with Mary Kay for Bagi to pick up later. (Lovejoy at p. 21-22).

### b.　　Plaintiff Bagi

Bagi claims he ultimately did not have time to pick the Letter up from Mary Kay. Therefore, he emailed her and asked Mary Kay to give the Letter to the Fire Chief. (Bagi at p. 555). Mary Kay agreed and gave the Letter to Chief French. (French at p. 48).

Because Lovejoy had originally given the Letter to Mary Kay to hold for Bagi, Mary Kay told Chief French the Letter was from Lovejoy. (French at p. 48). In fact, Chief French believed the Letter was from Lovejoy and the union and immediately called Lovejoy who denounced the Letter was from the union. (French at p. 56-59).

Meanwhile, on or about October 17, 2011, Bagi found time to go next door to City Hall and deliver the Letter to the Parma Human Resource Director that oversees the Fire Department, Elayne Siegfried. (Bagi at pp. 210-213; 547, 555). The Letter he delivered to Ms. Siegfried also contained a cover letter from Bagi stating that "members of the Parma Fire Department and myself are aware of actions taken by Captain Poznako that have a strong appearance of impropriety." (Ex. Y, Bagi correspondence dated 10/17/11 bate stamped 3926). Ms. Siegfried was copied because the City of Parma has an ethics policy that permits employees to notify the human resource director of fraudulent acts or violations of law. (French at p. 123). However the Parma ethics policy specifically requires employees must be prepared to provide information to document their observations. Section 5.1(D)(1) provides:

D. REPORTING VIOLATIONS

1.  An employee with a reasonable belief that another individual is committing a fraudulent act or violating a local, state, federal statute or the City's ethical standards bears a responsibility to bring the matter to the attention of the HR Director or Law Director.

    a. **Employees reporting such conduct must be prepared to document their observations in writing including persons involved; dates, times and places the violations occurred; the ordinance or regulation violated; etc.**

                                    * * *

(See Ex. 2, Parma Ethics policy bate stamped 2652-2654 (emphasis added) (French at pp. 123-126).

Ms. Siegried typically handled human resource complaints about harassment, etc. (French at pp. 79-80). The other signors did not know Bagi was going to submit the Letter to anyone other than the Chief. (Gaurdino at p. 154; Kolar at p. 62). However, upon receipt of the Letter, Ms. Siegfried, Parma Safety Director, Greg Baeppler, Chief French and Assistant Chief Dennis Ryan, immediately held a meeting. (Ex. AA, Affidavit of Greg Baeppler). Because the Letter involved issues involving the Fire Department and implied a Captain and a firefighter cheated, everyone agreed the Fire Department would investigate the allegations against Poznako and Fetter. (French at p. 52, 80; Affidavit of Baeppler). The group decided if the allegations were substantiated, Poznako and Fetter would be in serious trouble and might face criminal charges. (Id.).

## 11. Fire Department Investigation

The Parma Fire Department is a quasi-military operation. (French at p. 78). Complaints about the department follow a clearly defined chain of command. (French at p. 78). Chief French was upset Plaintiffs did not follow the chain of command and their complaints about a Captain and fellow firefighter should have gone to the Lieutenant. (French at p. 78-82).

Chief French repeatedly testified that when he read the Letter, the Letter accused Captain Poznako and Fetter of cheating. (French at p. 52, 55, 142). Assistant Fire Chief Ryan typically conducts investigations and recommends discipline. While the five Non-Plaintiff signatories offered to apologize and end the investigation into Captain Poznako and Fetter, the City had to proceed with the requested investigation. (Lovejoy at pp. 150-152; 206).

18

Ryan scheduled interviews with each of the signatories on or about November 9, 2011 to investigate whether Captain Poznako and Fetter cheated. (French at p. 154). Ryan asked them to bring any evidence with regard to the allegations in the Letter with them. Garrity rights were not read to the signatories because the investigation centered on Captain Poznako and Fetter. Each signatory admitted they had no direct or indirect evidence to support the allegations of cheating and bias levied against Poznako or of improper conduct by Fetter. (Ex. BB, Ryan Correspondence dated 1/3/12). When Bagi was interviewed with his attorney and friend Adam Bleile present, Bagi invoked his 5th Amendment right to remain silent.

After interviewing all of the signatories, Ryan interviewed Captain Poznako, Fetter and Iacoboni. However, because of the allegations against them and potential for criminal charges, "Garrity" instructions were read and they were advised of their right to counsel. (Ryan at pp. 104-106). Captain Poznako specifically denied he gave test questions or provided special assistance to any TEMS candidate. (Affidavit of Poznako). Poznako further explained the 2004 and 2011 TEMS testing process and did not refuse to answer any questions.

Fetter and Iacoboni also denied receiving any special assistance from Captain Poznako. Ryan also interviewed the Police Captain and commander of the SWAT team, Bobak, who also denied any knowledge of any wrongdoing regarding the 2011 TEMS test. Based upon his investigation—including the fact that none of the signatories could provide any information to support the allegations in the Letter, Ryan concluded that the allegations were false and notified Chief French. (Ex. BB, Ryan correspondence dated 1/3/12).

## 12.    City Investigation of Signatories

Having determined no basis for the allegations in the Letter levied against a Captain and fellow firefighter of cheating, Ryan investigated why the signatories created and signed the Letter. (Baeppler Affidavit of ¶ 7). Between November 9, 2011 and April 2012, Ryan interviewed 17 individuals, including many firefighters who created and administered the 2011 TEMS test as well as two interviews

of each of the signatories – only this time, each signatory was read their "Garrity" rights.  Because some signatories disputed whether they signed the Letter, a handwriting expert was also retained.  (French at p. 180).  Based upon his investigation, Ryan concluded that the signatories knowingly brought false allegations against Poznako and Fetter, and, by doing so, brought discredit upon the Fire Department.  In addition, because none of the signers had attempted to verify the allegations, Ryan concluded that they had also violated the Department's policy concerning use of the chain of command and preferred charges against the signatories of the Letter to Chief French on May 31, 2012[8].  Chief French reviewed Ryan's recommendations and based upon the seriousness of the false allegations and Vojtush's prior discipline, recommended to the Safety Director that Plaintiffs be terminated.[9]  (French at p. 30-31, 88, 111; Ex CC, French charges against Vojtush dated 8/12/12; Ex DD, French charges against Bagi dated 8/14/12).

The Non-Plaintiff signatories of the Letter ultimately received two tour suspensions or approximately 48 hours.  (Baeppler Affidavit at ¶ 9).  The Safety Director reduced Vojtush's discipline to a 13 tour suspension based on his involvement with the Letter and because he had a prior 10 tour suspension.  While Bagi received a more severe discipline based upon his creation of the Letter, solicitation of signatures and his insubordination in refusing to produce the original Letter when ordered by Ryan, the Safety Director reduced Bagi's discipline to a 34 shift suspension. (Id.; Ex. EE, Baeppler correspondence to Bagi dated 10/3/12, bate stamped 2642-2648; Ex. FF, Baeppler correspondence to Vojtush dated 10/3/12).

### 13.    Arbitration Determinations

Bagi and Vojtush grieved their discipline through arbitration.  The arbitrators in both cases ultimately concluded no information existed to suggest any improprieties with the 2011 TEMS test.  (Ex. GG, Bagi Arbitration decision dated 2/4/14; Ex. HH, Vojtush Arbitration decision dated 2/21/14).

---

[8] Signator Tibbitts retired from the Department and as a result, was not charged.  (French at p. 88).

[9] Additional charges were recommended against Bagi for failure to obey orders and produce the original Letter.

The arbitrators also concluded Plaintiffs' accusations were "false" and that "the Letter as a whole leaves no doubt" that Bagi and Vojtush were accusing Poznako and Fetter of serious misconduct. (Ex. GG at p. 46, 48; Ex. HH at p. 20). However, the discipline was too severe and the arbitrators in both appeals reduced the discipline imposed to an eight tour and two tour suspension respectively. (Id. at p. 56; Id. at p. 22). Neither Bagi nor Vojtush appealed the arbitrators' decisions. (Bagi at p. 252).

### 14.    Union Actions

The union represented Bagi and Vojtush throughout the grievance process pursuant to the CBA. (Lovejoy at p. 216). However, once the arbitrations were complete, Union President Lovejoy testified he recommended the Union file reverse charges against Bagi pursuant to the International Constitution for bringing "discredit or false charges against other members" and "engaging in conduct detrimental to the best interest of the association." (Lovejoy at pp. 217, 223). Lovejoy told Bagi during the arbitration process that the union was considering charging Bagi. The conversations were captured on phone conversations Bagi secretly recorded without Lovejoy's knowledge. (Lovejoy at pp 219-226 whereby recorded conversation was partially transcribed). Ultimately, the Union decided not to charge Bagi because the only remedy was to remove Bagi from the Union. (Lovejoy at pp. 217-218).

### 15.    Effect of Letter on the Department

The effect of the Letter on the Parma Fire Department has "huge." (French at pp. 189-190). Chief French testified that the Letter caused morale issues with the firefighters and "a lot of friction between the firefighters and the Union." (French at pp. 107-110; 189-190; Ryan at p. 116). Firefighting is a team job that requires team members to trust and work well with co-workers. (French at p. 110). Signatory Knecht summarized it as: "This Letter, this entire situation, this entire incident has caused a great divide amongst the department, amongst firefighters, amongst those guys even listed on here. . . Bagi, in my opinion, can't be trusted." (Knecht at p. 83;Gaurdino at p. 140-145). Knecht further explained how trust is extremely important amongst firefighters. (Id). In fact, when Bagi was going to transfer to Knecht's station, Knecht transferred to a different station in 2013 so he would not have to

work with Bagi because he could not trust him after the Letter. (Knecht at pp. 85-87). Others refused to work with Plaintiffs. (Gaurdino at pp. 143-145). In fact, when Bagi filed this lawsuit, he called and threatened Knecht with the lawsuit. (Ex. II, email from Knecht to union officers dated 3/13/14; Knecht at pp. 83-85, 88-89). Bagi has also threatened union charges be pressed against other signers that did not agree with him. (Gaurdino at pp. 133-140).

The Facebook photo attached to the Letter was also significant "because when we hire guys, almost everybody you hire talks about the camaraderie of a fire department and how they want to be part of this big family. And that is a big part of the job. You live with these guys. A third of your life you spend with your crew" and the photo used to imply favoritism further divided the firefighters. (French at p. 50; Kolar at p. 49).

The Letter made false accusations against a Captain and fellow firefighter. (French at p. 52, 131, 142). Chief French testified "I believe it was just, again, a personal attack against Captain Poznako… why else would you have those accusations with absolutely no evidence?" (French at pp. 135-136; Gaurdino at 103-104; Kolar at pp. 66-67). Chief French explained that employees can't just make up or assert false allegations as it would disrupt the firehouse. (French at p. 131).

The false accusations in the Letter also put the City Fire Department in a bad light and brought discredit to the City. (French at pp. 139-140; 145-146; 158-163; Gaurdino at 140-145). Articles were published on cleveland.com and in Fire Engineering, a national magazine for firefighters, about the false accusations. (French at pp. 194-195; Lovejoy at pp. 203-204; Ex JJ, cleveland.com article dated June 21, 2012; Ex KK, Fire Engineering article dated June 21, 2012; Fetter at pp. 65-66). Other fire chiefs were aware of the false accusations and it had the potential to impact the City's reputation with other fire chiefs and new recruits. (French at pp. 167-168; Baeppler Affidavit at ¶ 8).

Chief French and the Safety Director had to discipline Bagi because "He preplanned a personal attack against a Captain on the fire department, yes. It was preplanned. He thought about it way ahead of time. He actually got a lawyer to help plan the attack." (French at p. 189). Assistant Chief Ryan

testified the Letter "discredited a lot of the members of the department, which in turn discredits the department." (Ryan at p. 149-150).

Other firefighters testified how it affected them, including Fetter who was devastated and offered to resign from the TEMS Unit because of the Letter. (Fetter at pp. 63-67; Whelan at pp. 75-76, 82-86, 102-103, 150-152). It affected Fetter's family and even required Frantz to address Fetter's son's paramedic class where he was a student and was being harassed because of the allegations in the Letter. (Fetter at p. 64). Gaurdino testified the Letter was "an embarrassment" that divided the union and crushed morale by Plaintiffs whom he believes are "rats". (Gaurdino at pp. 140-145). As a marine, and co-worker, Knecht told Bagi at Knecht's deposition:

> A. And you asked me also what this has caused. Firefighter Bagi, at one time, was a marine. They have honor and commitment and respect and dignity.

> THE WITNESS [addressing Bagi] And you have none of that.

(Knecht at p. 85). Even Plaintiffs admit the conflict and disruption the Letter caused among firefighters, how it upset co-workers and how co-workers treat Plaintiffs. (Bagi at p. 455-486; Vojtush at p. 183).

## III.    LEGAL ARGUMENT
### A.    <u>SUMMARY JUDGMENT STANDARD</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249.

The Supreme Court has held, "…Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are

23

designed to secure the just, speedy and inexpensive determination of every action." *Celotext Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (internal citation omitted).

**B.      PLAINTIFFS' FIRST AMENDMENT CLAIM FAILS AS A MATTER OF LAW**

Plaintiffs' attempt to hide behind the First Amendment fails because their speech is not protected by the Constitution.  It is a question of law, not fact, whether the speech is protected by the First Amendment.  See *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).  Plaintiffs' claims fail as a matter of law for four reasons.

First, Plaintiffs' speech contains false accusations not protected under the First Amendment.  As set forth below, Plaintiffs admit they have no basis for accusing Captain Poznako of supplying answers to or otherwise favoring certain firefighters such as Fetter with respect to the TEMS test.

Moreover, Plaintiffs are not afforded protection under the First Amendment because they spoke as employees—not private citizens—when submitting their complaint about Captain Poznako and Fetter to their Fire Chief.  Because Plaintiffs submitted the internal complaint, like Plaintiff Bagi had been doing since the 2004 TEMS test to union officials and supervisors as a firefighter, their speech in not protected.

Lastly, even assuming the statements are subject to First Amendment protection, Plaintiffs' claim fails under the balancing test applicable to retaliation claims.  Pursuant to the balancing test, not only is the internal grievance regarding the TEMS test not a matter of "public concern," but the City's interest in the operation of the fire department and harmony among co-workers outweigh any potential First Amendment protection.

### 1.    Plaintiffs Made False Accusations Not Protected by the First Amendment.

Plaintiffs' First Amendment claim fails because their false speech is not protected by the First Amendment.  As the Sixth Circuit explained in *Westmoreland v. Sutherland*, the First Amendment does not extend to false statements if "the employee made statements with knowledge of, or reckless indifference to, their falsity."  *Westmoreland v. Sutherland*, 662 F.3d 714, 721 (6th Cir. 2011) (citing

24

*See v. City of Elyria*, 502 F.3d 484, 492–93 (6th Cir. 2007) and *Williams v. Commonwealth of Ky.*, 24 F.3d 1526, 1535 (6th Cir. 1994)). The City is entitled to judgment as a matter of law because Plaintiffs' complaint was made with reckless indifference to the falsity of the statements contained therein.

The Letter specifically accuses Captain Poznako of giving answers and Firefighter Fetter of accepting answers to the TEMS test. Not only do Plaintiffs admit they have no information that Captain Poznako or Fetter gave or accepted answers, but the undisputed facts establish Captain Poznako did not even draft the written test or have access to the answers before the exam was administered. (Poznako Affidavit at ¶ 4). All signatories of the Letter acted with blatant disregard for the truth, most of whom did not even read the Letter before signing it, including Plaintiff Vojtush. Rather, after an exhaustive internal investigation, Plaintiffs could not provide any information to support their false accusation that a captain and firefighter cheated. Rather, the Non-Plaintiff signatories admit that the Letter is an "attack" on Captain Poznako and Fetter with false statements that resulted in exposing them to ridicule and disgrace amongst co-workers and superiors alike. The worst part is that only Plaintiff Bagi and his lawyer knew the exact false allegations in the Letter when Bagi submitted the Letter to the Fire Chief. Plaintiff Vojtush never read the Letter before signing it and the other signatories that read it only did so on the condition that the Letter would not be submitted unless Bagi took the test and discovered improper facts to support the allegations, such as a top test scorer not being appointed. However, the exact opposite happened – Bagi lied to his co-workers and said he was taking the test to induce them to sign the Letter when he already decided he was not going to take the test. Because of his vendetta against Captain Poznako, he submitted the unfounded Letter to embarrass and "attack". The First Amendment does not protect such false defamatory speech.

**2.    Plaintiffs Made Their Complaints in Their Official Capacities.**

When public employees such as Plaintiffs make statements in their official capacities, the employees are "not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421

(2006). "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147.

Courts have viewed complaints from employees to their supervisors as speech made in their official, not private, capacities. *See*, *e.g.*, *Haynes v. City of Circleville, Ohio*, 474 F.3d 357 (6th Cir. 2007) (finding that officer's complaints about police canine unit to superiors were made pursuant to professional duties and not protected under the First Amendment); *Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (holding that a police sergeant's speech was not protected under *Garcetti*, where the sergeant was "on duty, in uniform, and engaged in discussion with her superiors").

In this case, the Plaintiffs and five Non-Plaintiff co-workers, accused their superior officer and fellow firefighter of improperly handling testing procedures used for hiring members of the internal TEMS Unit. All five of the Non-Plaintiff firefighters admit they signed the Letter as City firefighters either on duty at the time they signed it or on City property. This was not a situation where Plaintiffs were acting as concerned citizens at a public hall meeting. This was purely and simply a workplace complaint, made by employees to their boss, with each acting in their official capacities. In fact, as further evidence of the true nature of the situation, Bagi first went *to the Union* to air this grievance just as he did with his complaints about the 2004 TEMS testing process. The Union refused to intervene because the Union President believed the accusations were false and Plaintiffs could not support the false accusations. In fact, the union also intended to file charges against Plaintiffs for the false accusations.

In *Haynes,* under analogous facts, the Sixth Circuit found that the complaint at issue was not protected by the First Amendment. The Court noted that Haynes communicated to his superior, which indicates that he was speaking "in [his] capacity as a public employee contributing to the formation and execution of official policy, not as a member of the public writing a letter to the editor…." *Haynes*, 474

F.3d at 364.  For the same reasons, Plaintiffs' attempts in this case to characterize themselves as concerned citizens or speaking out as members of the public at large are baseless and the City's motion for summary judgment should be granted.

### 3. First Amendment Retaliation Analysis

Even if Plaintiffs overcome the threshold hurdles discussed above, their claims fail under the three-step inquiry for First Amendment retaliation claims:

> First, a court must ascertain **whether the relevant speech addressed a matter of public concern.** If the answer is yes, **then the court must balance** the interests of the public employee, as a citizen, in commenting upon matters of public concern and **the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.** Finally, the court must determine whether the employee's speech was a substantial or motivating factor in the employer's decision to take the adverse employment action against the employee.  (emphasis added).

*Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003) (internal quotations and citations omitted); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Plaintiffs' cannot establish the first two prongs: public concern and the balancing test.

### a. Plaintiffs' Speech Is Not a Matter of "Public Concern."

In order to establish a First Amendment retaliation claim, Plaintiffs' speech must be fairly characterized as rising to a matter of public concern. *Matulin v. Village of Lodi,* 862 F.2d 609, 612 (6th Cir.1988).  If the plaintiff's speech is not a matter of public concern, then it is unnecessary for courts to scrutinize the reasons for the plaintiff's discipline. *Connick v. Myers*, 461 U.S. 138, 146 (1983).  This inquiry is based on the "content, form, and context of a given statement, as revealed by the whole record." *Id*. at 147-48.

"Matters of public concern are those that may be 'fairly characterize[d] ... as relating to any matter of political, social, or other concern to the community." *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th Cir. 1997).  "Speech on such matters is protected because the First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information." *Id*.

Plaintiffs' unfounded accusations relate to an internal dispute with respect to a test for a specialized TEMS Unit. The TEMS Unit only supports the police SWAT unit, not the public in general. It is undisputed that the TEMS member's first priority is to treat SWAT members injured at a scene. Suspects and citizens that require medical care are treated by other agencies and only by TEMS members as a matter of last resort. Chief French testified the public would not even know what a TEMS Unit is or how it operates. (French at p. 34; Ryan at p. 35).

While Plaintiffs will undoubtedly argue their speech relates generally to public safety, this is an over-broad mischaracterization that ignores the context of speech and the true nature of it. The Letter had nothing to do with the actual qualifications of those selected to the TEMS Unit, nor do the Plaintiffs contend that the 2011 testing procedures resulted in placement of unsuitable firefighters on the unit. In fact, everyone agreed that Fetter is a stellar firefighter who was expected to excel on the test. Simply put, Plaintiffs' grievance does not relate to matters of public concern. In fact, quite the opposite is true: Plaintiffs' were upset with Captain Poznako and thought he was biased. The Letter did not address any threat to the health and safety of the community at large. Rather, the Letter was a false accusation about a Captain and a firefighter and an internal testing procedure. As the Letter does not rise to the level of "public concern", Plaintiffs' First Amendment claim fails.

### b. Parma Has a Superior Interest in Managing Its Firefighters than Plaintiffs Have in Accusing Superiors, Without Any Basis, of Unfair Testing Procedures.

If the speech is a matter of public concern, then the Court must balance the interests of the public employee, "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568; *see also Valot v. Southeast Local School Dist. Bd. of Educ*., 107 F.3d 1220, 1227 (6th Cir.1997). The Sixth Circuit has "observed that in balancing an employee's and an employer's respective interests, [the court] 'should consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the

relationship of loyalty and trust required of confidential employees.'" *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) (citations omitted). "Relevant factors in this regard include 'the manner, time, and place of the employee's expression,' as well as 'the context in which the dispute arose.'" *Id.* (citations omitted).

The government "must have wide discretion and control over the management of its personnel and internal affairs," including "the prerogative to remove [or discipline] employees whose conduct hinders efficient operation," because "[p]rolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *See Fitzpatrick v. City of Frankfort, Kentucky*, 305 Fed. App'x 258, 263-64 (6th Cir. 2008) (citations omitted); *Moorer v. Copley Tp.*, 98 F.Supp.2d 838, 844 (N.D. Ohio 2000) (Polster, District Judge) (citing *Arnett v. Kennedy*, 416 U.S. 134 (1974) ("A government employer must have wide discretion in the fulfillment of their public duties, including the right to suspend employees who hinder the effective operation of the business.") "These interests have particular resonance in the context of public safety departments, where loyalty, discipline, and workplace harmony are especially important." *Fitzpatrick*, 305 Fed. App'x at 264.

The Sixth Circuit has long recognized the "importance of deference to the city's judgment on the matter of discouraging public dissension within its safety forces," which "tip[s] the scales decisively in favor of the defendants." *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989) ("the potentially disruptive effect of [a complaint letter authored by police officers to their chief] on working relationships within the police force seems obvious to us"). "[W]here an officer's speech-related activity has the effect of materially disrupting his working environment, such activity is not immunized by constitutional guarantees of freedom of speech." *Id.* at 322-23 (citations omitted).

In *Moorer,* a police officer authored an open letter calling the police chief a liar in connection with the chief's decisions as to who should receive training opportunities within the police department. *Moorer*, 98 F.Supp.2d at 841. In granting summary judgment in favor of the defendants, Judge Polster

found that the plaintiff's First Amendment interests were minimal and "did not outweigh the threat of disruption and disharmony to the Copley Township Police Department in the effective discharge of its duties created by Plaintiff's open letter." *Id.* at 844. "A 60–day suspension was a measured response by the Trustees, particularly given that the Police Chief recommended that Plaintiff be fired." *Id.*

Likewise, in this case, it is clear that Plaintiffs' interests are severely outweighed by the serious impact (both potential and actual) on the operations and morale of the fire department. By making false accusations against a captain and fellow firefighter, Plaintiffs created discord and dissention amongst the ranks. In fact, various firefighters, including the Chief and Plaintiffs, acknowledge that the accusations have in fact had a significant negative effect on the department, resulting in morale issues and an overall distrust and disharmony among co-workers. Thus, the City's motion for summary judgment should be granted.

**IV.    CONCLUSION**

For all the foregoing reasons, Defendant, City of Parma, respectfully requests the Court grant Defendant's motion for summary judgment.

Respectfully submitted,

*/s/ Michelle J. Sheehan*
Michelle J. Sheehan (0062548)
Jonathan H. Krol (0088102)
**Reminger Co., L.P.A.**
101 West Prospect Ave., Suite 1400
Cleveland, OH  44115
(216) 687-1311; Fax: (216) 687-1841
msheehan@reminger.com
jkrol@reminger.com

*Attorneys for Defendant*

**<u>CERTIFICATE OF TRACKING AND PAGE LIMITATION</u>**

The undersigned counsel hereby certifies that via Court Order dated June 23, 2014, this Court assigned this matter to the Standard Track. Counsel further certifies and that the Memorandum in Support of Defendant's Motion for Summary Judgment adheres to the thirty (30) page limitation this Court approved on February 23, 2016.

Respectfully submitted,

*/s/ Michelle J. Sheehan*
Michelle J. Sheehan (0062548)
Jonathan H. Krol (0088102)
**Reminger Co., L.P.A.**
101 West Prospect Ave., Suite 1400
Cleveland, OH 44115
(216) 687-1311; Fax: (216) 687-1841
msheehan@reminger.com
jkrol@reminger.com

*Attorneys for Defendant*