IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SCOTTIE A. BAGI, *et al.*, | ) | CASE NO. 1:14 CV 558 |
| | ) | |
| Plaintiffs, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| vs. | ) | **PLAINTIFFS' OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION FOR** |
| CITY OF PARMA, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |

## I.    STATEMENT OF FACTS

### A.    <u>Introduction & Background</u>

Plaintiff Scottie Bagi served as United States Marine from 1994 to 2000, and he was in

the unit called the Military Operations in Urban Terrain or "MOUT," which is a tactical unit in

The Marines (Bagi at 6-10, 42-43, 66-67; Bagi Dec at ¶2).[1]  The Tactical Emergency Medical

Support Unit (hereinafter "TEMS Unit") of the Parma Fire Department works along with and as

a benefit to the City's Police SWAT Unit, and it provides firefighter/paramedics who provide

emergency medical service in high-risk situations to the police and residents (Bagi at 51; Whelan

---

[1] The deposition of Scotti Bagi took place over two days, and day one of his deposition testimony
has been filed with the Court as evidence under Fed. R. Civ. P. 56 as Doc # 54-4.  References to the
first day of Plaintiff Bagi's testimony will be as "Bagi" followed by the page number in the deposition
transcript. The second day of Plaintiff Bagi's deposition has been filed with the Court by Plaintiff as
evidence under Fed. R. Civ. P. 56, with pages 361-542 redacted (not cited) under the parties Stipulated
Protected Order.  References to the second day of Plaintiff Bagi's testimony will be as "Bagi day 2"
followed by the page number in the deposition transcript.  The Declaration of Plaintiff Bagi has been
filed as evidence under Fed. R. Civ. P. 56 as attached hereto, and references to his testimony in the
Declaration will be as "Bagi Dec" followed by the ¶ number of his sworn statement in the Declaration.

1

at 38-39; Ryan at 35).[2]  From his background in the Marines and as a Firefighter/Paramedic for

12 years in 2011, Plaintiff Bagi understood the importance of the TEMS Unit and how it played a

significant safety role in protecting and serving the City's Police SWAT Unit and the public

(Bagi Dec at ¶2).

In 2011, Scott Bagi observed an issue with the integrity of the administration of the test

for new members on the Fire Department's TEMS Unit, and he was concerned how this may

affect the effectiveness of the Unit and overall safety to the City's Police and community (*See,*

Section I(C) *infra*; Bagi Dec at ¶3).[3]  So he wrote a letter about his observations and concerns to

the Chief of the Parma Fire Department of this safety issue, and he had six other Parma

Firefighters sign the letter – including Plaintiff Gary Vojtush (Bagi Dec at ¶4).[4]  The speech at

issue was raised through Plaintiffs' communication in this letter, which predicted the outcome of

the 2011 TEMS Unit test (Bagi at 131-32, 158, 163-65, Ex 11 *Letter* Bagi Dec at ¶4).  Bagi held

onto the letter until his predictions came true after the test, and then he delivered it with his

observations to the Chief and the City of Parma's Human Resource Department (Id.; Bagi Dec at

---

[2] The deposition transcripts of Mike Whelan Doc # 56-1 and Dennis Ryan Doc # 64-1 have been filed with the Court as evidence under Fed. R. Civ. P. 56. References to their testimony will be made as "Whelan" or "Ryan" followed by the page number in their deposition transcripts.

[3] Those chosen for TEMS Unit was a genuine concern to the public because they provide safety to the police and to injured citizens, and possibly the perpetrator of the situation (*See*, Whelan at 39, 115-116). The Unit creates good community relations for the Fire Department by providing this service to the City's Police Department (Id. at 39).

[4] The letter was signed by Plaintiffs and Parma Firefighters Chris Tibbits, Tom Kolar, Dan Gaudino, Mike Kinney, and Dave Knecht (Bagi at 166-67, Ex 11 *Letter*). Exhibits used in the depositions referenced herein as evidence have the same exhibit numbers in each deposition, and the Deposition Exhibits cited by Plaintiff have been filed separately with the Court as evidence under Fed. R. Civ. P. 56. References to the deposition exhibits will be identified following the deposition where the exhibit is testified about or referenced and labeled "Ex" followed by the exhibit number and a brief description of the exhibit.

¶¶ 5, 6).  The letter was delivered as directed in the City's policy that pertains to the report of possible ethical violations by the its employees, and it addressed safety concerns to the community (Bagi at 138, 180-81; Bagi Dec at ¶¶ 6, 7).

This case involves an overreaction by the leaders in the City of Parma's Fire Department about the report and observations raised by Plaintiffs in the letter as a matter of public concern. Specifically, the letter was addressed to Parma Fire Chief John French, and it said the Firefighters were concerned based on their observations of a prior TEMS Unit Test in 2004 that was conducted by Captain Poznako – the same individual who oversaw the 2011 test (Bagi Dec at ¶3; Bagi Ex 11 *letter*).[5]  The Firefighters believed that the Captain would choose his friends to be on the TEMS Unit rather than the most qualified candidates (Id.).  They were concerned because the test was not a standardized test, which supplied a high risk that those selected would not be "the best performer on the test[.]" (Id.).  The letter was written before the 2011 test was administered, and predicted that Firefighter Fetter who is a friend of Captain Poznako would be "selected due to bias of Captain Poznako." (Id.).  The letter acknowledged that Fetter was a good person and good fireman, but it expressed concern over the credibility of the test and also whether Fetter had the years of service as a fireman eligible to be on the TEMS Unit (Id.).  The letter stressed concerns and the importance that the most qualified person be selected for the TEMS Unit because the Firefighters who signed the letter wanted the Fire Department and themselves to perform in the best possible manner for the community (Id.).  They sought to put the Chief on notice of their observations and asked for his intervention (Id.).

---

[5] The only thing of relevance of the 2004 test is that it was administered by Captain Poznako which caused concern for the 2011 test (Bagi Dec at ¶3).

The overreaction by the City included adverse employment action against Plaintiffs in the form of discipline, which included the threat of termination and the eventual suspension and loss of income to them.  This action by the City was directly linked to Plaintiffs' communication of what they believed to be a potential ethical violation associated with the TEMS Unit testing that could affect the public safety and welfare – even though they did not have concrete proof of the violation.  John French, who was the Chief of the Parma Fire Department at the time, testified he saw a problem with Plaintiffs' speech specifically because it was placed in writing (French at 50, 80).[6]  With this belief, the City through its Chief initially sought Plaintiffs' termination, and the discipline eventually resulted in the loss of 8 tours for a total of 192 hours and income in the amount of approximately $4,800 for Scotti Bagi and in the loss of 2 tours for total of 48  hours and income in the amount of $ 1,250.00 for Gary Vojtush (Bagi day 2 at 286; Vojtush day 2 at 260).[7]

The reaction of the Chief and City toward the speech and letter created, at the very least, a true chilling effect on the speech of the employees in the City's Fire Department (Lovejoy at 130-

---

[6] The Chief was concerned because the issue raised by Plaintiffs was in writing and sent to the City's Human Resource Department and, as such, would become public (Id.).  The deposition transcript of John French Doc # 55-1 has been filed with the Court as evidence under Fed. R. Civ. P. 56.  References to his testimony will be made as "French" followed by the page number in the deposition transcript.

[7] This loss of income was in addition to other negative effects related to the investigation and disciplinary process in the Fire Department (Id.). The deposition of Plaintiff Gary Vojtush took place over two days, and day one of his deposition testimony has been filed with the Court as evidence under Fed. R. Civ. P. 56 as Doc # 54-11.  References to the first day of Plaintiff Vojtush's testimony will be "Vojtush" followed by the page number in the deposition transcript.  The second day of Plaintiff Vojtush's deposition has been filed with the Court by Plaintiff as evidence under Fed. R. Civ. P. 56 – with pages 278-385 (not cited) redacted under the parties Stipulated Protected Order. References to the second day of Plaintiff Vojtush's deposition will be "Vojtush day 2" followed by the page number in the deposition transcript.

31 Ex 104 *Kinney pre-disciplinary hearing tr,* 132 Ex 105 *Kolar pre-disciplinary hearing tr*).[8]

The union president was told by other firefighters that they did not sign the letter because they did not want to be linked to the letter for fear of retribution (Lovejoy at 132-33).  As will be discussed *infra* Sections I(D)&(E), the Chief's reaction to the letter violated the City's policy for its employees to report ethical issues to the City's Human Resource Department.  Importantly, the reaction by the Chief and City of Parma was also contrary to the law that protects the free speech and constitutes retaliation in violation of Plaintiffs' First Amendment rights.

**B.**  **2011 TEMS Unit Test – Captain Poznako's Demeanor & Involvement in the 2004 TEMS Test**

Captain Poznako administered and approved the 2011 TEMS Unit test (Whelan at 45, 62-63).  The Chief assigned Captain Poznako to administer the 2011 TEMS Unit test, and the Captain was responsible for the test (French at 71).  The 2011 TEMS Unit test was not a civil service test (Ryan at 44), rather it was administered by Captain Poznako and the Parma Fire Department (Poznako at 69, 107 Ex 52 *2011 TEMS Test Procedure*).[9]  The test included a written

---

[8] The ability of employees in Parma's Fire Department to speak out on matters that address issues of pubic safety clearly outweighed any detrimental effect caused by the speech.  Incredibly, when asked whether the discipline to the Firefighters for the letter would present a chilling effect on their speech, the Chief testified that if everybody brought to the attention "everything that popped into their head, if everything they saw occur, if they thought there was some kind of cloak-and-dagger cheating scam going on and they just fired off a letter, I believe that would clog up the system." (French at 131).  The Firefighters' union president testified that the union felt that the suspensions against Plaintiffs were excessive (Lovejoy at 76, 78, 119).  The deposition of Patrick Lovejoy Doc # 57-1 has been filed with the Court as evidence under Fed. R. Civ. P. 56.  References to Mr. Lovejoy's testimony will be made as "Lovejoy" followed by the page number in the deposition transcript.

[9] Firefighter Michael Whelan was asked by Captain Poznako to prepare parts of the 2011 TEMS test (Whelan at 42-43). Firefighter Michael Frantz was chosen to grade the run reports of the Test, and he explained that Captain Pozanko asked him to outline the procedure how he graded the run reports (Frantz at 9-10, 45, 63-64). The deposition transcript of Michael Frantz has been filed with the Court by Plaintiffs as evidence under Fed. R. Civ. P. 56, and references to his testimony will be made as "Frantz" followed by the page number in the transcript.

portion, a review of trauma assessment, a physical, an evaluation of run reports, and an oral interview (Whelan at 43).[10]

The purpose of the test for the TEMS Unit was to see who was best for the job and to promote fairness (Ryan at 53; Whelan at 39, 41; Bagi 68, 180-81, 223-24, 264; Kinney at 14, 15, 22, 32-33; Knecht at 26, 30; Ryan at 24, 53; Guadino at 30; Poznako at 68; Tibbits at 33).[11] There was concern because the Captain was seen by the Parma Firefighters to be controlling, a bully, very biased, manipulative, conniving, and vindictive (Kinney at 24-26, 89; Pozanko at 144, Ex 58 *Kinney depo tr* at p. 13; Knecht at 48-49; Bagi Dec at ¶3).  Captain Pozanko would berate others on the Department, and he had an explosive personality (Kinney at 28-29; Tibbets at 35).[12] Plaintiffs and the other Firefighters signed the letter because they wanted the 2011 TEMS Unit test to be administered in a fair manner (Bagi at 74, 75; Bagi Dec at ¶7; Kinney at 14, 32, 52, 62-63, 68, 73, 88, 96; Tibbets at 33, 47, 49, 57; Knecht at 52, 67, 70; Gaudino at 90-91, 114, 129,

---

[10] The Chief explained there would be no bias based on the Captain's relationship with any firefighter on the written portion of the test (French at 69-70).  But it was also clear that the interview portion of the test was subjective (Poznako at 100), and there was the possibility of bias in the test through friendships in the Department (Ryan at 52).  Captain Poznako did not ask questions or grade the participants, but he was present in the oral interview portion of the test (Poznako at 60-61).  The deposition transcript of Peter Poznako has been filed with the Court by Plaintiffs as evidence under Fed. R. Civ. P. 56, and references to his testimony will be made as "Poznako" followed by the page number in the deposition transcript.

[11] The deposition transcripts of Mike Kinney Doc # 62-1, David Knecht Doc #59-1, Christopher Tibbits Doc # 63-1, and Dan Gaudino Doc # 61-1 have been filed with the Court as evidence under Fed. R. Civ. P. 56.  References to their testimony will be made as "Kinney," "Knecht," "Tibbits," and "Gaudino" followed by the page number of their transcripts.

[12] In one instance, the Captain in charge of the TEMS unit called fire fighter Gaudino a faggot because he drank a frappe – which Gaudino took as a harassment not just joking around (Kinney at 28; Ryan at 54-55; Pozanko at 133-34, 137, Ex 57 *Gaudino Invest Hearing tr* at pp. 15-17; Gaudino 56-58, 63).

6

130-31).

Captain Poznako was not trusted and a question of propriety existed as a common belief based on the manner in which he administered a past TEMS Unit test in 2004 (Kinney at 63, 65-66, 79, 87-88; Tibbets at 15-16; Bagi Dec at ¶3). With respect to the 2004 test, Captain Poznako himself told Plaintiff Bagi that he was directed by the Parma Police that if Firefighter Mlady was not selected that there would not be a TEMS Unit from the Fire Department (Bagi at 66-67; Bagi Dec at ¶3).[13] Concerns of the manner in which Captain Pozanko administered the 2004 test had already been brought to the attention of the union president in 2009 (Lovejoy at 41, 167-68).

Plaintiffs and other Parma firefighters believed Captain Poznako would pick who he wanted to be on the TEMS Unit despite the 2011 test, and a common belief existed upon among them that firefighter Ricky Fetter, who was friends with the Captain, would get the job because the Captain wanted him on the unit (Kinney at 13-14, 23, 30, 32, 43, 70, 81; Bagi at 134, 183, 199, 216, 267; Tibbets at 46; Knecht at 54; Poznako at 60, 63).  The union president said that he had run into situations that because of the way the Captain handled it, he could "understand where some of [the firefighters who signed the letter] had concerns or dealings with Captain Poznako in the past would have concerns as to his integrity to a degree." (Lovejoy at 101).[14] Because of Plaintiff Bagi's past experiences with Poznako, the union president testified that Bagi

_____

[13] Tony Mlady was drinking buddies with members of the Parma Police Department (Bagi at 67, 184-85; Poznako at 107).  The TEMS Unit was also seen by some Firefighters as a "good old boys club" (Kolar at 8; Bagi at 73-74).  The deposition transcript of Tom Kolar Doc # 60-1 has been filed with the Court as evidence under Fed. R. Civ. P. 56.  References to his testimony will be made as "Kolar" followed by the page number in the deposition transcript.

[14] Parma Fire Chief French testified that he could not dispute whether a common belief existed in the Department related to Captain Pozanko's fairness in his involvement with the test – as was suggested in the speech at issue in this case (French at 156-57).

7

did not intentionally make a false statement in the letter to the Chief (Id. at 115-16).  Captain Poznako even told Firefighter Whelan before the 2011 test that, "He had some concerns of people bringing up that the test might not have been fair[.]" (Whelan at 124).

One issue in particular stressed in the letter that caused concern and confusion was the qualification or eligibility to be on the TEMS Unit related to the number of years of service on the Fire Department required for the firefighter (Tibbets 53-54 – who believed the years increased from 2 to 3 years in 2011; Knecht at 31-32, 90-91 – who believed it was reduced from 5 to 3 years; Ryan at 40, 42-43 – who thought at one time 5 years were required but then it became 2 years; Whelan at 56-57 – who believed there was minimum of 3 years required to take the test).  Plaintiff Bagi believed that 5 years were required – an eligibility that Firefighter Fetter did not meet (Bagi at 140-41, 177; Bagi Dec at ¶3).

Based on the common belief of Captain Pozanko that came from their personal observations of his demeanor, past conduct, the past test in 2004, and the confusion of the years of service needed to be eligible for the TEMS unit, Plaintiffs and the others signed the letter in good faith (Bagi at 74, 75, Ex 11 *Letter*; Kinney at 14, 15, 30-31, 32, 38, 41-42, 52, 62-63, 68, 73, 79, 87-88, 92, 93-94, 96; Tibbets at 14, 20-21, 33, 45, 47, 49, 57; Knecht at 26, 28, 41, 52, 53, 67, 70; Gaudino at 90-91, 114, 129, 130-31; French at 134; Ryan at 121).

In October 2011, Plaintiff Bagi gave the letter in a sealed envelope to the vice president of the union, and it was provided to the union president who opened the envelop (Lovejoy at 15-16, 113-14).[15]  Union president Lovejoy did not deliver the letter to Chief French – the letter was

---

[15] Plaintiff Bagi explained to the union president that he mailed a copy of the letter to himself before the test (Id. at 19).

given to the Chief by the Chief's secretary at the request of Bagi (Lovejoy 21, 22; Bagi Dec at ¶5). After the letter was delivered to the Chief, the union president met with Assistant Chief Ryan and Captain Pozanko (Lovejoy at 23). In October 2011, Plaintiff Bagi also delivered the letter to Parma's Human Resource Department with a cover letter, which stressed that he would be subject to retribution because of the contents of the letter to the Chief (Ryan at 65-66, Ex 12 *letter to HR*; Bagi Dec at ¶6; Kolar at 13-14, Ex 12 *Letter to HR*).

**C.     Public Concern Of Test Result & No Self Interest**

The TEMS Unit is an EMS team that supports the City of Parma's Police SWAT Unit (Ryan at 36). Thus, the best possible and most qualified candidate for the TEMS Unit was also important and a matter of public interest and safety (Bagi at 154-55, 180-81, 222-23; Bagi Dec at ¶2; Tibbets at 20-21; Knecht at 30, 43; Guadino at 30; Kolar at 12; French at 32, 34-35, 138; Ryan at 34-36; Whelan at 115-16). Protection of the City's Police SWAT Unit is a clear public interest, and the qualifications of those on the TEMS Unit is important to this interest (Id.).

Because there was a concern that Captain Pozanko would influence the test, the Firefighters who signed Plaintiff Bagi's letter perceived a need to raise questions about the Captain and the manner in which the test was administered (Bagi at 74, 75, Ex 11 *Letter*; Kinney at 14, 15, 30-31, 32, 38, 41-42, 52, 59, 62-63, 68, 73, 79, 87-88, 92, 93-94, 96; Tibbets at 14, 20-21, 33, 45, 47, 49, 57, 71; Knecht at 26, 28, 41, 52, 53, 67, 70; Gaudino at 90-91, 114, 129, 130-31; French 134; Ryan at 121). The Firefighters signed the letter to protect the integrity of the test (Bagi at 38; 180-81; Kinney at 32-33; Knecht at 30; Gaudino at 16, 17, 30, 47-48, 49, 88, Ex 60 *Gaudino Invest Hearing* at pp. 6-7, 87-91, Ex 61 *Gaudino Pre-discp Hearing* at pp. 11-16, 20-22; Tibbets at 27-28; Lovejoy at 101, 146).

9

Plaintiffs Bagi and Vojtush had no self interest in the outcome of the test because they did

not take the test (Bagi at 117-18, 264; Vojtush at 111).[16]  Further, the issue raised by the

Firefighters through the letter was not part of their job description as firefighters and this effort in

communication of the observations in the letter was not a part of their ordinary duties (Ryan at

112; Poznako at 16; Gaudino at 24-25, Ex 32 *Firefighter Duties*).

**D.**   **City's Policy of Reporting**

The City of Parma has a policy that pertains to Ethics.  This policy provides:

> An employee with a reasonable belief that another individual is committing a
> fraudulent act or violating a local, state, federal statute **or the City's ethical
> standards bears a responsibility to bring the matter to the attention to the
> HR Director** or Law Director. (Emphasis added)

(Lovejoy at 69, Ex 39 *Ethics Policy* at p 3 sec D).[17]  Plaintiff Bagi had a right and obligation

under the City's policy to take the issue to the City's Human Resource Department, and also to

his superior – Chief French (Lovejoy at 112, 115; Bagi Dec at ¶6).  The policy further provides

that if someone brings a violation to the human resource department in good faith – that

individual would not be adversely affected (Kinney at 50-52, Ex 22 *portion of Ethics Policy* at

sec D(1)(b)).

In terms of proof, the policy states that:

Employees reporting such conduct must be prepared **to document their**

---

[16] Like Plaintiffs, the other Firefighters who signed the letter that drew concern over Captain
Pozanko also had no self interest in the outcome of the test because they also did not take the test
(Kinney at 11, 15, 41-42, 71, Ex 11 *Letter*; Tibbets at 20, 47; Ryan at 112-13; Kolar at 8-9; Knecht at 27;
Guadino at 11).

[17] This policy applied to the City's Fire Department and also placed a responsibility on the City's
employees to report to either the City's Human Resource Department or Law Director (French at 123-24,
Ex 39 *Ethics Policy* at p. 3 sec D).

> **observations in writing** including persons involved; dates, times and places the
> violations occurred; the ordinance or regulation violated; etc. (emphasis added)

(Ex 39 *Ethics Policy* at p. 3 sec D(1)(a)).  The policy only requires Parma's employees to be able

to document their observations in writing (Id.).  The City through the Fire Department's Chief

dispute what is required in terms of proof when reporting a violation of ethical standards (French

at 125-26).  The City's policy provides that the individual who makes the report must have a

reasonable belief of what they report, but Chief French is unclear of who determines if the

reporter has reasonable belief (Id. at 126-27), and he said that he does not know who determines

under the City's policy whether the report was brought in good faith (Id. at 129).[18]

## E.      Chief's Reaction to the Letter

Chief French recognized that the City's Human Resource Department handles

employment matters with respect to harassment and discrimination (French at 79-80).  This

would also include employment matters related to retaliation under Ohio and federal

discrimination laws, and the Chief also recognized that Firefighter Bagi's letter stated that he was

concerned that he and those who signed the letter would suffer retaliation based on what was

raised in the letter (Id. at 65-66).

Chief French was irritated when he read the letter (French at 49).  He wished the issue

was not put in writing due to his concern that Plaintiffs' speech would go public (Id. at 50, 80).[19]

The Chief "did not want any negative light portrayed on the Parma Fire in the public[.]" (Id. at

_____

[18] At the time of Plaintiffs' speech, the Assistant Chief was not even aware of this policy that
directed the City's employees to report to the Human Resource Department (Ryan at 93).

[19] The Chief's concern was that the issue was put in writing and sent to the City's Human
Resource Department and would become public, and he wished Plaintiffs did not "start this mess."
(French at 50, 80, 127).

145).  He said, "I don't want to hear any negative crap about Parma Fire[.]" (Id. at 146).

The Chief believed that discredit was brought to the Fire Department because Plaintiffs' letter went outside his office to the City's Human Resource Department (Id. at 166-68).[20]  But the union president testified that the City never provided evidence that the Department was discredited by Plaintiffs' speech (Lovejoy at 49, 107-08).  The union president testified that the City saw that its Fire Department was discredited simply because the letter went to the City's Human Resource Department "because other people [could] see what's going on, . . ." as an airing of dirty laundry (Id. at 108, 110).  Defendant has not pointed to any actual impact from Plaintiffs' speech, and there is no evidence that the operation of the Fire Department was hindered.  The Chief also believed that, despite the City's Ethics Policy, the letter should not have been given to the City's Human Resource Department because it was not in the Fire Department's chain of command (French at 140, 141).[21]

**F.    Effect of Letter on the Fire Department – Lack of Disruption**

Despite his reaction, the Chief also testified that he did not view that Plaintiff Bagi

---

[20] But when Chief French was asked what he would do if one of his firefighters came to him with such a report, he testified that he was "Not exactly sure . . . I'm not exactly sure what I would have done, to be honest with you." (French at 122). The Chief said that he would have spoken to the individuals involved, but he would not have written it down (Id.). When asked whether such procedure for making such a complaint is in writing, the Chief responded, "No. It's more commonsense[,]" and he testified that he did not think there was any instruction on how his firefighters would make such a complaint (Id.).

[21] But Plaintiffs were not disciplined because they went outside the Fire Department's chain of command (Ryan at 71, 93). Plaintiff Bagi initially gave the letter to the Firefighters' union president Lovejoy, but Bagi was told that it was not a union matter and Lovejoy made it clear the union would not forward the letter (Bagi at 212; Bagi Dec at ¶5; Lovejoy at 37), and Chief French cannot dispute that union president Lovejoy said that Plaintiffs' complaint and concern raised in the letter was not a union matter (French 128-29).

harbored any ill will toward the Fire Department (French at 101).[22] Consistent with the reason they signed the letter and in the spirit of the City's reporting policy, the Firefighters testified that they did not believe Ricky Fetter, who was mentioned in the letter, was bad mouthed or that his credibility was affected by the letter (Kinney at 106, 108 Ex 11 *letter*),[23] or that Captain Poznako actually cheated or gave answers to the test (Tibbets at 69-70). Firefighter Kolar said that he expressed his opinion and did not do so to bring discredit to anyone in the Department (Kolar at 35). *See, also,* Declaration of Plaintiff Bagi at ¶7.

In an effort to justify the reaction and adverse employment action against Plaintiffs, the City's Chief claimed the letter from the Firefighters disrupted the Fire Department (French at 88-89, 107-09). But there is an issue of fact for the jury to decide based on other evidence through the testimony of a number of other Firefighters and Assistant Chief that there was no disruption sufficient to take away or chill Plaintiffs' free speech.[24]

Specifically, the firefighters testified that the letter written by Mr. Bagi did not disrupt the Department, it ran fine, and they were able to perform their jobs after the letter (Kinney at 42, 94-

---

[22] The Chief, who is the ultimate decision maker of discipline in the City's Fire Department testified of the contents of the letter that, "I believe [Scott Bagi] felt that there was some truth to the basis of it." (French at 163). He was uncertain whether Bagi believed every single thing in the letter when he wrote it or whether he added extra facts to make it more effective (Id.).

[23] Firefighter Kinney testified that he did not observe Fetter's credibility in the Department affected by the letter (Kinney at 108). Ricky Fetter testified that "bad blood" exists between him and either Plaintiff and did not file charges against them (Fetter at 73, 95). The union president also testified that the speech did not affect Fetter's credibility (Lovejoy at 195-96).

[24] The union president testified that there was already a reluctance in the Department for firefighters to come forward and make statements on the record about concerns or issues, and they did not want to take a risk of negative treatment from the administration by making complaints (Lovejoy at 101-03). Lovejoy gave an example of who a firefighter treated negatively after he was critical about the way EMS runs were made in the Department (Id. at 104-06).

13

95; Kolar at 16; Tibbets at 57; Gaudino at 28). Firefighter Gaudino said after the letter was signed – it was a non-issue among the fire fighters, and he never heard officers in the Parma Fire Department say that they felt publicly criticized because of the letter (Gaudino at 13, 19). Assistant Chief Ryan explained that the Fire Department continued to run as it did before and that any turmoil created did not affect its ability to run (Ryan at 115-16). Assistant Chief Ryan said he was shocked when saw the letter but the letter did not offend or anger him, and he does not recall an indication from Chief French that the letter offended or angered him (Id. at 67-68; 93-94).[25]

Chief French acknowledged disruption that came from the investigation of the Firefighters who signed the letter and their disciplinary hearings (French at 117).[26] There were extensive pre-disciplinary and disciplinary hearings for all of the Firefighters who signed the letter (Lovejoy at 26-27, 107). Firefighter Michael Whelan testified said that he was offended and angered by the letter, and that there was a great divide in the Department caused by the letter (Whelan at 75-77, 82-84). But Firefighter Whelan could not be specific as to what he meant by such a *divide*, and he testified that the letter did **not** interfere with his ability to perform his job and he does not know of any fireman who was so affected by the letter that they were unable to perform their job (Whelan at 98, 100).[27] The Chief claimed an investigation was necessary

---

[25] Firefighter Frantz who was involved in the grading the test testified that he never even saw the letter in question (Frantz at 25-26).

[26] It is an undisputed fact that the investigation and disciplinary hearings process was completely under the control and direction of the City. Plaintiffs and the other Firefighters who signed the letter had no choice in whether they participated in the investigation and disciplinary process (Ryan at 103, 117; Lovejoy at 31-32).

[27] Firefighter Whelan explained that the issue of trust in the Fire Department included when one firefighter snitches on another (Whelan at 157). Firefighter Frantz also said that there was an unspecified

because of the letter (French at 88-90), but there were a number of serious issues that arose in the Department, in which the Chief acknowledged no investigation was necessary (French 94-99).[28]

## G.    Adverse Employment Action Taken Against Plaintiffs & the Others Who Signed The Letter

After the letter was received by the Chief and the Human Resource Department, there was an investigation of Captain Pozanko undertaken by Assistant Chief Ryan (French at 153).  The union president who met with Assistant Chief Ryan and Captain Poznako after the letter was delivered, testified that the Assistant Chief was abrupt when he investigated the Firefighters who signed the letter – but he was not when he spoke to or investigated the Captain (Lovejoy at 92-93).  It was as though the Assistant Chief really did not investigate Captain Poznako, and the City already knew there was no foundation to the allegations against the Captain before any investigation (Id. at 93, 94).  The Assistant Chief was just going through the process of investigating the Captain to get it done, and it did not seem to the union president that Ryan really conducted an investigation of the Captain (Id. at 94).[29]

Chief French recommended to have Plaintiffs terminated (French at 30-31).  In light of

"little division in the ranks," but that Plaintiffs' speech did **not** interfere with the firefighters' ability to perform their jobs in the Department (Frantz at 113-14).

[28] The Chief was aware and believed that an investigation was not necessary when Captain Poznako called Firefighter Gaudino a faggot when he drank a frappe (See, fn 12 supra, and Kinney at 28; Ryan at 54-55; Pozanko at 133-34, 137, Ex 57 Gaudino Invest Hearing tr at pp. 15-17; Gaudino 56-58, 63). Assistant Chief Ryan testified that when a significant question arose whether a firefighter violated his leave from work, he only spoke to the individual with no resulting discipline, which the Chief was also made aware (Ryan at 100; French at 95-96).

[29] When there were no charges found against him, Captain Poznako called for a reverse investigation against those who signed the letter (Ryan at 69-70, 153; Pozanko at 131-32, Ex 42 Bagi Disciplinary Hearing at p. 58-59; Lovejoy at 98-99). Thus, there was an investigation into the letter itself and the Firefighters who signed the letter were then subjected to discipline (Ryan at 67; Tibbets at 18, 25; Knecht at 36-38, 43-44; Kolar at 11-12, 21; Gaudino at 18, 28).

Plaintiffs' speech this was the most severe of sanctions sought.  Significantly, less severe sanctions could have been pursued with other options to resolve the matter at the lowest level in the Department – for instance a letter in the employment files of the Firefighters, but the Chief was not clear in his testimony why he chose the most severe form of punishment (French 62, 67).[30]

The Chief testified that he was bothered by the fact that the Plaintiff Bagi went outside the chain of command with the letter – but at the same time, Bagi was not specifically disciplined for going outside the chain of command (Ryan at 71, 93).[31]  The Firefighters were disciplined because what they had written in the letter turned out to be incorrect (Fetter at 87-88).[32]  The City saw a difference because Plaintiffs' observations were placed in writing rather than made with an oral complaint (Ryan at 128).[33]

Since the letter was signed by Parma Firefighters – the City viewed it as an "either/or" situation – someone needed to be disciplined.  If the allegations had merit, then Captain Pozanko would be disciplined.  If the allegations were false, then the Firefighters who signed the letter

---

[30] Even the arbitrator believed the sanctions sought against Plaintiffs to be too severe (*See*, Doc # 54-35 *Arbitration Decision* at 46, 48; Doc. 54-36 *Arbitration Decision* at 20).

[31] Again, the Chief had concern about the complaint being put in writing outside his office, despite the City's policy that directed *and* required the report to be taken to the Human Resource Department (*See*, Section I(D) *supra*).

[32]  The deposition transcript of Ricky Fetter has been filed with the Court as Doc # 58-1 as evidence under Fed. R. Civ. P. 56, and references to his testimony will be as "Fetter" followed by the page number of his deposition transcript.

[33] The Chief explained that once something is placed in writing, it is perceived in the Department as more serious *and* something that must be acted upon (French at 96). The Department's Assistant Chief also viewed written speech different than mere rumors that float around the Department (Ryan at 124-25). The Assistant Chief admitted that if a citizen signed the letter -- there would be no action taken against that individual (Ryan at 109-11).

would be disciplined (Ryan at 69, 123).  Thus, any concern raised in the Fire Department about

ethical issues – if proven to be false, would meet the individual who reported the concern with

discipline.[34]  This approach would serve to truly chill the speech of the Parma Firefighters, which

is not a minimal effect on the City employees' First Amendment interests (*See*, Bagi Dec at ¶8).

## II.     STANDARD FOR REVIEW OF DEFENDANT'S MOTION

The standard to rule on Defendants' Motion is well known to this Court and has been

recently reaffirmed by the United States Supreme Court.  Tolan v. Cotton, 572 U.S. __, 134 S.Ct

1861 (May 5, 2014).  The party moving for summary judgment bears the initial burden to show

an absence of evidence to support Plaintiff's case.  Van Richardson v. Burrows, 885 F. Supp.

1017, 1020 (N.D. Oh. 1995).  Summary judgment may only be granted when ". . . the moving

party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  All evidence must be

viewed in a light that is most favorable to Plaintiffs and all reasonable inferences from the

evidence must be drawn in their favor.  Tolan, 134 S.Ct at 1866.[35]

The Supreme Court cautioned against weighing evidence in the determination of motions

brought under Rule 56, and specifically against failing to give credit to evidence that contradicts

---

[34] The Firefighters who signed the letter did not believe that it was fair for them to be disciplined because they brought their concerns and observations forward (Kinney at 51-52, 89; Knecht at 43-44; Gaudino at 79-80; Bagi Dec at ¶8). In terms of proportionality, the union president testified that other employees of the City of Parma received far less punishment than Plaintiffs – including more serious issues that involved racial epitaphs (Lovejoy at 125-29).

[35] *See, also*, White v. City of Taylor, 849 F. Supp. 1186, 1188 (E.D. Mi. 1994), *citing*, United States v. Diebold, Inc., 369 U.S. 654, 655 (1961), *and* Bender v. Southland Corp.,749 F.2d 1205, 1210-11 (6th Cir. 1984). Defendant only discharges its initial burden if it points out that there is a **total** absence of evidence to support Plaintiffs' claims. White, at 1189, *citing*, Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  **Then** the burden shifts to Plaintiffs to present specific facts showing triable issues exist.  Id. Plaintiffs' evidence to defeat summary judgment need not be the sort of evidence that is admissible at trial. Id. at 1189.  And the belief that the non-moving party will not succeed at trial is not a sufficient basis for refusing that party her day in court.  Rogers v. Peabody Coal Co., 342 F.2d 749 (6th Cir. 1965).

the moving party's position on key factual issues. Id. at 1867. This Court must remember that each party ". . . come to this case with their own perceptions, recollections, and even potential biases, [and] [i]t is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." Id. at 1878.[36]

## III.    LAW & ANALYSIS

## A.    Introduction & Issues Before the Court

At issue before the Court through Defendant's dispositive motion is whether Plaintiffs' speech is protected by the First Amendment based on whether it addressed a matter of public concern (Defendant's issues 2 & 3), its truthfulness (Defendant's issue 1), and whether the City was justified in its discipline of Plaintiffs due to disruption caused by their speech (Defendant's issue 4).

There is no question that the Defendant City through the Chief of its Fire Department authorized the investigation and discipline of Plaintiffs directly because they signed and produced the letter that called into question the ethical propriety of the TEMS Unit test.  There is no question whether Plaintiffs would have been subject to discipline – including possible termination but for their speech contained in this letter.  There is also no question that the City engaged in this conduct through the decision makers related to employment decisions through the

---

[36] Because Plaintiffs can point to evidence in their favor, credibility determinations are not for the Court at summary disposition, but are for the trier of fact at trial.  Hanover Ins. Co. v. Am. Engineering Co., 33 F.3d 727, 731-32 (6th Cir. 1994).  A differing statement of what occurred, ". . . creates a genuine dispute of material fact, which necessitates a trial and precludes summary Judgment." MOORE'S FED. PRAC. 3d §56.11[5][a] p 56-108 (3/97) (Where the authors use an example if a party claims that the light was green in his favor but a witness testifies the light was red against that party, then relevant and substantial evidence on both sides exist – precluding summary judgment).  Further, an emerging problem has also been recognized in civil rights cases, and courts have been criticized for engaging in an undue weighing of facts – deferring to the moving party's characterization of the facts. Id. §56.11 [5][b] p. 56-110.

Fire Department's policies of discipline.[37]

> In order to make out a *prima facie* case for a First Amendment retaliation claim,

> a public employee who claims that an employment decision was made in retaliation for engaging in protected speech, must show that: (1) "the plaintiff was engaged in constitutionally protected speech; (2) the plaintiff was subjected to an adverse action or was deprived of some benefit; and (3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action."

Banks v. Wolfe Co. Bd. of Educ., 330 F.3d 888, 892 (6th Cir. 2003), *citing*, Brandenburg v. Housing Auth. of Irvine, 253 F.3d 891, 897 (6th Cir. 2001) *and* Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). Public employees must show that their speech touched on a matter of public concern, and that their "interest in making such statements outweighs the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Banks, at 892, *citing*, Pickering v. Board of Educ. of Township High School, Dist., 205, 391 U.S. 563, 568 (1968), Mt. Healthy City School Dist. Bd. of Educ., *supra*, at 284, *and* Bailey v. Floyd County Bd. of Educ., 106 F.3d 135, 144 (6th Cir. 1997). *See, also*, Westmoreland v. Sutherland, 662 F.3d 714, 718-19 (6th Cir. 2011), *citing*, Garcetti v. Ceballos, 547 U.S. 410, 417 (2006) *and* Pickering, *supra*, at 568. The nature of the adverse employment action is the concern that action by the public employer would chill an employee to engage in such speech. *See*, Ellison v. Knox Co. Bd. of Educ., No. 3:15-CV-126,

---

[37] In the case *sub judice,* there is no question that the motivating factor of discipline toward Plaintiffs was the letter concerning the 2011 TEMS Unit test. Unlike Haynes v. City of Circleville, Oh., 474 F.3d 356 (6th Cir. 2007), relied on by Defendant, the City of Parma does not and cannot point to evidence of discipline from the refusal to follow direction or report to work. Related to Plaintiff Vojtush, Defendant attributes the extent of discipline sought based on a prior employment related events – but this does not pertain or mitigate that fact that the City sought this discipline against him solely due to the speech contained in the letter.

(E.D. Tenn., Jan. 15, 2016) (unreported Memorandum Opinion & Order at 2, attached hereto).[38]

*See, also*, <u>Dye v. Office of Racing Comm'n</u>, 702 F.3d 286, 303 (6th Cir. 2012), *citing*, <u>Center for Bio-Ethical Reform, Inc. v. City of Springboro</u>, 477 F.3d 807, 822 (6th Cir. 2007).

The issues of causation and whether the City acted under its policy in its discipline of Plaintiffs is not drawn into question by Defendant's dispositive motion.

**B.**     **Letter, Appearance of Propriety & 2011 TEMS Unit Test (Defendant's Issues 2 & 3)**

*1.  Concern of a Public Interest – Plaintiffs' Speech Was Based On Their Observations on Propriety Regarding the 2011 TEMS Unit Test – Not their Discipline*

" [T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." <u>Westmoreland</u>, *supra*, at 718, *citing*, <u>Garcetti v. Ceballos</u>, *supra*, at 417 *and* <u>Connick v. Myers</u>, 461 U.S. 138, 143 (1983).  "Connick instructed that speech involves a matter of public concern when it can fairly be considered to relate to `any matter of political, social, or other concern to the community.'" <u>Westmoreland</u>, *supra*, at 719, *citing*, <u>Connick</u>, *supra*, at 146.  "`Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment.'" <u>Riddle v. Egensperger</u>, 266 F.3d 542, 550 (6th Cir. 2001), *citing*, <u>Lucas v. Monroe Co.</u>, 203 F.3d 964, 973 (6th Cir. 2000).

The facts demonstrate that the concerns set forth in Plaintiffs' speech were related to the ethical proprietary with the manner in which the Parma Fire Department chose individuals to be

---

[38] The letter that contained the speech was prepared by Plaintiff Bagi. With respect to Plaintiff Gary Vojtush, who only signed the letter, the Sixth Circuit held that to receive First Amendment protection, a plaintiff does not have to generate the entire the speech. *See*, <u>Cockrel v. Shelby Co. School Dist.</u>, 270 F.3d 1036, 1048-49 (6th Cir. 2001), *citing*, <u>Hurley v. Irish-American Gay, Lesbian & Bisexual Group</u>, 515 U.S. 557, 570 (1995).

part of the TEMS Unit.  This concern related to the ethical duties of the City government legally

doing its job – which is, by definition, speech related to a matter of public interest.  *See*, Connick

v. Myers, *supra*, at 146.  *See, also,* Chappel v. Montg. Co. Fire Prot. Dist. No. 1, 131 F.3d 564,

576 (6th Cir. 1997), *citing*, Marohnic v. Walker, 800 F.2d 613, 616 (6th Cir.1986) *and* Solomon

v. Royal Oak Township, 842 F.2d 862, 865-66 (6th Cir.1988).  Plaintiffs' speech also concerned

the protection provided to the City's police officers and the public out of concern that the best

possible candidates were placed on the TEMS Unit to secure this interest.[39]

The Sixth Circuit distinguished quibbles about another public employee who spends too

much time at the water cooler than actually working over a plaintiff's complaints of

misappropriation and mismanagement.  The Court reasoned that the "`[p]ublic interest is near its

zenith when ensuring that public organizations are being operated in accordance with the law,'

when `expos[ing] graft and corruption,' and when `seeing that public funds are not purloined' or

wasted."  Chappel, *supra*, at 576, *citing*, Marohnic v. Walker, *supra* at 616 *and* Solomon v.

Royal Oak Township, *supra*, at 865-66.  "Exposing governmental inefficiency, mismanagement,

or misappropriation of public money are matters `of considerable public significance, . . .'"

Stinebaugh v. City of Wapakoneta, No. 14-4262 at 4 (6th Cir., Nov. 10, 2015) (not recommended

for full text publication, attached hereto), *citing*, Garcetti, *supra*, at 425 *and* Chappel, *supra*, at

576.  This is particularly true when the public governmental action may effect safety.  Id., *citing*,

Westmoreland, *supra*, at 719-20 *and* Mattox v. City of Forest Park, 183 F.3d 515, 521 (6th Cir.

---

[39] Defendant appears to provide a distraction from Plaintiffs' speech by the suggestion that such complained about their treatment under the City Fire Department's personnel rules related to their discipline (*See*, Defendant's Issue 3). The discipline sought and delivered by the City was adverse employment action and the retaliation from the speech. Complaints about the investigation and discipline after the letter is not the claimed protected speech in this case.

1999) (observing that speech concerning "the workings of the [city's] Fire Department and public safety" fell easily within matters of public concern).

Plaintiffs' statements about the fairness of the test and their concerns that the most qualified individual would not be chosen for the TEMS Unit is unquestionably related to a matter of concern to the community – which would undoubtedly want a system in place to choose the best possible candidates to provide medical services to the police and public in critical situations. This concern definitely touches on a matter of safety to the public because the TEMS Unit provides specialized medical attention to the police department and public in crisis situations. "The Sixth Circuit has found that `[s]peech on matters directly affecting the health and safety of the public is obviously a matter of public concern.'" Ellison, supra, at 2, citing, Chappel, supra, at 578.  Here, Plaintiffs' speech – which questioned the workings of the Parma Fire Department and public safety was definitively a matter of public concern.  Mattox, supra, at 521.

### 2. No Personal/Self Interest & Not Part of Official Duty

Plaintiffs had no personal or self interest related to their job in the outcome of the test, and they reported the matter as a concern to the public.  In this regard, Haynes v. City of Circleville, Oh., 474 F.3d 356 (6th Cir. 2007), relied on by Defendant, is distinguishable from Plaintiffs' claim.

In Haynes, the plaintiff attempted to cloak his complaint and statement as one of a matter of public concern – but it all came back to him and his inability to obtain overtime pay through the canine training process.  As a police officer, Haynes had developed the standard operating procedure for the canine unit and worked with his dog as part of his day-to-day professional activities.  Thus, his writing to the police chief about the canine training was clearly part of and

made pursuant to his specific job and professional duties, and was not protected under the First Amendment. Haynes, at 364. Contrary to Haynes, the TEMS Unit and its testing was not part of Plaintiffs' professional day to day duties and, unlike the plaintiff in Haynes, Bagi and Vojtush had no personal interest to gain from the outcome of the test. They were not up for consideration because they did not take the test and any overtime or professional recognition that would come from being placed on the unit.[40] Plaintiffs presented concerns whether the best possible candidates from the Fire Department would be on the Unit to protect the police and public.

Like the plaintiff in Westmoreland, although Scott Bagi identified himself as a public employee he delivered the letter that contained the speech while he was off duty (Bagi at 209-10), and "[n]othing in the record supports the claim that plaintiff's expression was made pursuant to a task that was within the scope of his official duties." Westmoreland, supra, at 719. Also like the plaintiff in Westmoreland, Scott Bagi did not only provide the communication to his superior – he also provided it to the City's Human Resource Department. Id. at 720. Also, like the plaintiff in Westmoreland, Plaintiffs' speech addressed actions by the Defendant public employer that they saw could jeopardize public safety. Id. at 719-20.

Under the analysis set forth in Garcetti, Plaintiffs' speech was not made pursuant to their official duties, and nothing in the record supports that their expression in the letter was made pursuant to a task that was within their official duties. Id. at 719, relying on, Garcetti, supra, at

---

[40] Firefighter Whelan explained that there was a benefit in overtime pay associated with those who were chose to work on the TEMS Unit (Whelan at 114). Bagi testified that presence on such a team would help a firefighter's career through the experience (Bagi at 46). In addition, there is no dispute that the report of the propriety of the TEMS Unit test was not part of the Firefighters' day to day job or in the furtherance of their ordinary responsibilities of their employment. See, Stinebaugh, supra, at 4, citing, Lane v. Franks, 134 S.Ct 2369, 2379 (2014).

421.  Here, Plaintiffs' expression was that of true concern for the integrity of the test and not a mere "employee beef" as they had no interest in the test outcome themselves individually because they did not take the test.  Thus, Plaintiffs had no job self-interested motivation to promote the letter.  *See analysis in* Westmoreland, *supra*, at 719, *referring to*, Haynes, *supra*, at 365 *and* Fox v. Traverse City Area Pub. Sch. Bd. of Educ., 605 F.3d 345, 350-51 (6th Cir.), cert. denied, _ U.S. _, 131 S. Ct. 643 (2010).  Public employees "may [still] receive First Amendment protection for expressions made at work" (Garcetti, *supra*, at 420-21), and important to the consideration of whether the speech was public is whether ". . . the speech is ordinarily within the scope of the speaker's duties[.]  Stinebaugh, *supra*, at 4, *citing*, Lane v. Franks, 134 S.Ct 2369, 2379 (2014).

    "`[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee-rather than citizen-speech.'"  Id.  "As the Supreme Court recently explained, the focal point of *Garcetti* `is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'"  Id. "Thus, if a public employee's speech ordinarily falls within the scope of his duties, he does not speak as a citizen for First Amendment purposes."  Id., *citing*, Garcetti, *supra*, at 421.  "But where the speech ordinarily does not fall within the scope of the public employee's duties, he speaks in his role `as a citizen even if his speech involves the subject matter of his employment.'"  Id., *citing*, Boulton v. Swanson, 795 F.3d 526, 534 (6th Cir. 2015).  "After *Lane*, the *Garcetti* exception to First Amendment protection for speech . . . must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment."  Id.  In other words, even a public employee's personal motives – such as not getting along with Captain Poznako – cannot be dispositive of whether the speech was a matter of

public concern.  Id. at 3-4, *citing* Chappel, *supra*, at 574.

Plaintiffs did not convey their speech as a part of their job, while they were on duty in uniform and in a discussion with superiors.  *See*, Mills v. City of Evansville, 452 F.3d 646, 648 (7th Cir. 2006), *referenced in*, Haynes, *supra*, at 364.  In fact, Plaintiff Bagi was told that this was not a matter that could be handled as part of his job through the union (Ryan at 71; Bagi Dec at ¶5; Bagi at 212).  Further, for the speech to be a public concern, it does not have to be made directly to the public or in a public setting to obtain protection under the First Amendment. Ellison, *supra*, at 3, *citing*, Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 415 (1979) (where the Court held that a public teacher's First Amendment protection was not lost because she decided to communicate to her employer rather than spread her views in public).

Thus, Defendant's dispositive motion fails on the basis that Plaintiffs' speech was not a matter of public concern.

**C.**     **Speech Without Evidence of Wrongdoing is Protected Unless Defendant Demonstrates that the Speech was Made with Intentional or Reckless Disregard for the Truth** (Defendant's Issue 1)

Defendant suggests that Plaintiffs' speech does not secure the protections of the First Amendment because the statements were not true.  But to succeed in this argument, the City employer must show with evidence that the Plaintiff employees "knowingly or recklessly made false statements, [and] a public employee is not required to prove the truth of his or her speech in order to secure the protections of the First Amendment."  See v. City of Elyria, 502 F.3d 484, 492 (6th Cir. 2007), *citing*, Rodgers v. Banks, 344 F.3d 587, 601 n.5 (6th Cir. 2005) ("We note that even if Plaintiff's opinion ultimately proved to be incorrect, this does not deprive her statements of First Amendment protection."), *and* Chappel, *supra*, at 576-77 (rejecting defendants' argument

25

that an employee's speech alleging corruption and unethical conduct cannot address matters of public concern absent proof of the truthfulness of his speech).

The law is clear that simply because public employees lack evidence of their allegations does not mean the employees made a knowingly or recklessly false statement.  Chappel, *supra*, at 576-77.  Similar to the case *sub judice* the speech of the plaintiff in Chappel concerned allegations of unethical conduct of in the county's fire department.  The public employer claimed the plaintiff's speech was not on a matter of public concern because it was "'. .. nothing more than accusations of incompetent management,' and Chappel `has presented no 'concrete evidence' that 'public corruption' occurred.'"  Id. at 576 (the Court citing the defendants' argument).  Similar to the City of Parma's argument, the defendants argued that Chappel's speech regarding the chief's alleged conflict of interest was not protected because Chappel had no actual evidence related to the conflict or corruption.  Id.  In response, the Sixth Circuit explained that on this point the defendant employer, "misinterpreted the relevant case law."  Id.

When a concern related to safety is advanced, the Court rejected the public employer's argument that the employee's speech was not protected because he did not provide any evidence to substantiate the allegations of his speech.  "A public employee is not required to prove the truth of his speech in order to secure the protections of the First Amendment.  Chappel, at 576, *citing*, Williams v. Commonwealth of Ky., 24 F.3d 1526, 1535-36 & n. 3 (6th Cir. 1994), *and relying on*, Pickering v. Bd. of Educ., *supra*, at 571-72.

It is the defendant employer's burden to establish with evidence that the public employees ". . . knew or [were] recklessly indifferent to the fact that [their] speech was false."  Id., *citing*, Williams, at 1535-36.  To obtain protections under the First Amendment, Plaintiffs do not have

26

to show that their statements were true; Rather, the burden is on Defendant to prove that the statements "were not only false, but were made with intentional or reckless disregard for the truth," Westmoreland, *supra*, at 721, 722, *relying on*, Chappel, *supra*, at 576 *and* Farhat v. Jopke, 370 F.3d 580, 591 (6th Cir. 2004).

Because Defendant did not point to evidence that Plaintiffs made the statements with intentional or reckless disregard for the truth, its dispositive motion fails on the issue of whether the speech was not a matter of public concern based on its truthfulness, and the *Pickering Balancing Test* enters the analysis.

**D.      The Balancing Test (Defendant's Issue 4)**

As discussed above in Sections III(B)&(C) *supra*, Plaintiffs' speech addressed a matter of public concern, so the Court must engage in a balancing test to determine whether their interest in the speech was outweighed by the City's interest.  Rodgers v. Banks, *supra*, at 601.  The test to balance whether Plaintiffs' speech is protected under the First Amendment from retaliation by the public employer examines disruption in the City's workplace that arose from the speech along with the right and interest to make the speech.  Defendant has pointed to no evidence that Plaintiffs' letter meaningfully interfered with the performance of their duties, undermined a goal or purpose of the Fire Department, created disharmony among co-workers, or destroyed a relationship of loyalty and trust required of confidential employees.  The only disharmony that resulted came from the disciplinary process the public employees were put through – the result of the speech itself (*See*, Sections I(F)&(G) *supra*).

Defendant suggests that the discipline was necessary to maintain the City's interest and promote its ability to perform public services.  But there is a balancing test to determine whether

27

the public employee's speech may still be protected in light of this concern. *See*, Pickering v. Bd. of Educ. of Tp. High School Dist., *supra*. When considering the *Pickering Balancing Test*, The Sixth Circuit explained:

> Before engaging in a "particularized balancing" of the competing interest at stake in this case, * * * it is important to note that "if an employee's speech substantially invole[s] matters of public concern, an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action." (citations omitted)

Cockrel v. Shelby Co. School Dist., 270 F.3d 1036, 1053 (6th Cir. 2001). In Cockrel, the Court found that the employee's speech substantially involved matters of public concern and, as such, weighed the *Pickering* balancing test in the employee's favor. Id., *supra*, at 1053-54.

The question then becomes whether the public employees' speech meaningfully caused disruption in the City's operation. Stinebaugh, *supra*, at 5, *citing*, Williams, *supra*, at 1536. As set forth in Section I(F) *supra*, there is a great deal of evidence that (but for the discipline against them) Plaintiffs' letter did not interfere with the performance of their duties or impair discipline.

Some amount of disharmony may result from the public employees' speech, but this does not weigh the scale against the employees' right of free speech. The Sixth Circuit explained that while the public employer has a legitimate goal to main efficient operation, ". . . we have never held that the relatively minor associated risk of disharmony as is present in this case would ordinarily overcome [this] interest." Rodgers, *supra*, at 601, *citing*, Williams, *supra*, at 1536-37 (rejecting the argument that the state interest of avoiding disharmony between the plaintiff-employee and those she reported outweighed the public interest in reporting politically corrupt practices in the governmental office), *and* Marohnic v. Walker, *supra*, at 616 (When an employee communicates an issue in an effort to expose unscrupulous behavior in the workplace, "his

28

interests are co-extensive with those of his employer; both [should] want the organization to function in a proper manner.").  In Lane, the Supreme Court cautioned that a strong showing of a governmental interest is necessary under the *Pickering* balance test to overcome the employees' rights under the  First Amendment.  Lane, *supra*, at 2381.  *See, also*, Stinebaugh, *supra*, at 5 *and* Cockrel, *supra*, at 1053.

In light of Lane, *supra*, cases cited by Defendant that suggest that the  *Pickering* scale should be weighed in the City's favor are distinguishable, and each case presented facts where the public employee's speech was either not a matter of public concern or very little of the speech touched on a matter of public concern.  *See*, Fitzpatrick v. City of Frankfort, 305 Fed. Appx. 258 (6th Cir. 2008) (which *not referred to Defendant's Memorandum* – under 6th Cir. R. 28(g) was not recommended for publication);[41] Brown v. City of Trenton, 867 F.2d 318 (6th Cir. 1988),[42] and Moorer v. Copley Township, 98 F. Supp. 2d 838 (N.D. Oh. 2000).[43]

---

[41] In Fitzpatrick, the plaintiff was an advocate for the union of the city's fire department, which was not even recognized by the city for collective bargaining purposes. In this regard, much of the plaintiff's speech was related to matters that challenged the department's policies and personnel matters. Id. at 259. The speech that remained an issue in the case related to a personnel matter that directly affected the plaintiff's additional training, and he challenged whether the chain of command related this training was proper. Id. Thus, little of the plaintiff's speech involved a matter of public concern(as it all pertained to the plaintiff and his job), which factored into the *Pickering Balancing Test*. Id. at 264, *relying and citing* Connick, *supra*, at 150 (the greater the extent to which the speech involves matters of public concern, the stronger the public employer's showing must be to succeed in the balancing test). Further, unlike the employer in Fitzpatrick, the City of Parma cannot show evidence of dissension in the Department (for example a drop in union membership by half) Fitzpatrick, *supra*, at 265.

[42] Similarly, in Brown, the police officers plaintiff's speech did not touch on a matter of public concern because it pertained to the failure of the department to address their complaints about the running of a team. The Sixth Circuit correctly affirmed the decision that the complaints were "`. . . issues of internal police affairs[,] which are not protected by the First Amendment in this context.'" Brown, at 319. Since there was little that concerned a matter of public interest in the speech – the balancing test weighed toward the public employer's interest and concern of workplace harmony.  Id. at 322.

[43] In Moorer, the speech at issue is also distinguishable from Plaintiffs' speech because it concerned the plaintiff's public, written complaint about his discipline for previously exercising his free

Defendant has failed to point to any meaningful disruption in its Fire Department that resulted from Plaintiffs' speech and because there is, at least, a genuine issue of material fact over any such disharmony, the City of Parma cannot show that it was justified in disciplining Plaintiffs to chill their speech.[44]  This is especially true in light of the fact that their speech addressed a matter that affected the safety of the City's SWAT unit and the public.

## IV.    CONCLUSION

Based on the foregoing, Plaintiffs' speech at issue in this case is protected from retaliation under the First Amendment because the speech addressed a matter of public concern, which dealt with ethics and safety of the community.  Defendants' failed to present evidence that Plaintiffs intentionally or recklessly made a false statement with their speech, and when City's interest is weighed against the interest of the speech, Defendant is not entitled to Judgment as a matter of law, and their Motion for Summary Judgment must be denied.

---

speech rights. The court must remember that in issue 3 the Defendant City attempts to distract from what speech Plaintiffs claim in the case at bar is protected. The speech Plaintiffs seek to protect is the observations about ethical and safety issues raised in the letter prepared by Plaintiff Bagi – not their attitude about the unfair discipline in response to the letter. Like the plaintiff in Brown, *supra*, the plaintiff in Moorer did not establish that he spoke on a matter of public concern and, as such, the public employer was provided with wider discretion toward the effective operation of the department over the officer's speech. Moorer, *supra*, at 843-44.

[44] Not only has the City failed to point to any specific disruption, its evidence runs contrary to evidence pointed to by Plaintiff that the letter written by Bagi did not disrupt and the Department ran fine, and the firefighters were able to perform their jobs after the letter (Section I(F) *supra*).  *See, also*, Tolan, 134 S.Ct *supra*, at 1866, 1867 *and* MOORE'S FED. PRAC. *supra*, at §56.11[5][a] p 56-108 (example of different testimony of parties on the color of a traffic signal).

Respectfully submitted,

/s/ Dennis J. Niermann
DENNIS J. NIERMANN (0007988)
Shaker Launch House
P.O. Box 202295
Shaker Heights, Ohio 44120
216-375-2696
Email: dennis@niermannlaw.com

/s/ David Glenn Phillips
DAVID GLENN PHILLIPS {0046827}
The Brown Hoist Building
4403 St. Clair Avenue
Cleveland, Ohio  44103
(216) 531-0123
fax:  (216) 881-3928
Email: d.g.phillips@sbcglobal.net (for service)
civilrightslaw@sbcglobal.net

Attorneys for Plaintiffs

31